**UNITED STATES of America, Plaintiff–Appellee,**

v.

**David Furtado GRAY, Defendant– Appellant.**

No. 96–4617.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 2, 1997.

Decided Feb. 25, 1998.

**ARGUED:** Joseph A. Balter, Supervisory Assistant Federal Public Defender, Office of the Federal Public Defender, Baltimore, Maryland, for Appellant. Harvey Ellis Eisenberg, Assistant United States Attorney, Baltimore, Maryland, for Appellee. **ON BRIEF:** James K. Bredar, Federal Public Defender, Office of the Federal Public Defender, Baltimore, Maryland, for Appellant. Lynne A. Battaglia, United States Attorney, Gregory Welsh, Assistant United States Attorney, Baltimore, Maryland, for Appellee.

Before WILKINSON, Chief Judge, and WIDENER, MURNAGHAN, ERVIN, WILKINS, NIEMEYER, HAMILTON, LUTTIG, WILLIAMS, MICHAEL, and MOTZ, Circuit Judges.

Affirmed by published opinion. Judge NIEMEYER wrote the opinion, in which Chief Judge WILKINSON and Judges WIDENER, ERVIN, WILKINS, HAMILTON, LUTTIG, WILLIAMS, MICHAEL, and MOTZ joined. Judge MURNAGHAN wrote a dissenting opinion.

## OPINION

NIEMEYER, Circuit Judge:

For the gangland-style killing of Jessie Waller, a jury convicted David F. Gray of murder in aid of racketeering activity in violation of 18 U.S.C. § 1959(a)(1) and use of a firearm in relation to a crime of violence in violation of 18 U.S.C. § 924(c). The district court sentenced him to life imprisonment. As Gray's principal argument on appeal, he contends that the district court improperly admitted confessions obtained from him while he was in custody without probable cause. Rejecting this argument, as well as the others made by Gray, we affirm.

### I

On October 19, 1993, while Jessie Waller, Tracy Ward, and Antoine Little were walking in an alley off East Preston Street in Baltimore, three men ambushed them, firing 9mm automatic pistols. As Little attempted to escape, the men chased and also fired at him. As a result of the ambush, Waller was killed and Little and Ward wounded. Police investigators recovered 29 bullet casings and 9 bullet fragments from the scene of the murder and the adjacent street where Little had fled, and forensic analysis confirmed that three 9mm firearms had been used in the

attack, with 14 bullets fired from one of the weapons.

Several months later, when FBI agents and state law enforcement officers were reviewing tapes of wiretaps conducted in connection with an unrelated drug trafficking investigation, they were able, based on information from the tapes, to connect someone with the street name of "David" or "Fat David" with the killing of "Black Jessie." They believed that "Black Jessie" was Jessie Waller. When a state officer suggested that "Fat David" might be David Gray, who was known to the state officers, the investigators conducted a police record check of Gray and discovered that he had been arrested in March 1994 for possession of a 9mm pistol. They subjected the pistol seized from Gray in connection with that arrest to forensic tests, and the tests disclosed that the pistol seized from Gray in March 1994 was the same pistol that fired 14 of the bullets recovered from the October 1993 murder scene.

The agents then placed Gray's photo in a six-photo array and showed the array to Ward and Little, the two survivors of the attack. Little, who had fled the scene, was unable to identify anyone. Ward, however, stated that the photo of Gray "resembled" one of his attackers.

Following this identification, FBI agents and Maryland state law enforcement officers decided to bring Gray in for questioning. After looking for him unsuccessfully for weeks, they located him on August 1, 1994, at his probation officer's office. They handcuffed him and took him from that office to the state's attorney's office in Baltimore City, where, at 11:20 a.m., they placed him in a room alone. Shortly after 1 p.m., after Gray had been waiting in the room for about one hour and forty-five minutes, the officers began questioning Gray about other crimes and making small talk. At that time, state homicide detective Marvin Sydnor, who was in charge of the Waller murder investigation, had not yet arrived at the office. When Detective Sydnor arrived at 1:40 p.m., he read Gray his *Miranda* rights, and Gray initialed a form which stated he understood those rights and waived them. Thereafter, over the course of the next five hours, Gray

admitted to involvement in the murder of Waller and provided a number of incriminating details about the crime. He admitted that he had been approached by a drug lord, Ronald Whitener, with an offer of $5,000 for Waller's life. Gray also admitted to gathering two other people to accompany him in hunting down and killing Waller. When Gray requested an attorney, at about 6:30 p.m., the interview ended and Gray was formally arrested.

At a pretrial hearing on Gray's motion to suppress the confession because he had been arrested without probable cause and had been manipulated into making inculpatory statements, the district court granted the motion to suppress as to statements made by Gray before he was read his *Miranda* rights because the court found those statements incident to an illegal arrest. The court found, however, that the statements made after Gray had been read his rights were admissible because the confessions were not coerced and were too causally attenuated from the initial illegal arrest to have been tainted by the arrest.

After the jury convicted Gray of murder in aid of racketeering activity and illegal use of a firearm, the district court sentenced Gray to life in prison under U.S.S.G. §§ 2E1.3(a)(2) & 2A1.1 (establishing base offense level of 43 for first-degree murder in aid of racketeering activity).

This appeal followed.

## II

Gray contends that when he was handcuffed and brought in for questioning on August 1, 1994, he was arrested without probable cause and that the statements he made while in police custody were the direct product of that illegal arrest. Accordingly, he argues that the district court erred in not suppressing the statements that he made on August 1 after receiving *Miranda* warnings and in admitting them at trial. Gray also argues, alternatively, that the statements he gave on August 1 were not voluntary and should be suppressed on that ground.

The district court agreed with Gray that when the officers took him in on August 1 for

questioning, they in fact arrested him since he was "compelled to accompany the officers and agents to the office." The court also agreed that the law enforcement officers did not, at that time, have probable cause to arrest Gray. The court concluded:

> The temporal nexus between the October shooting and the March 8th seizure of the gun from Mr. Gray is simply not sufficient, in the judgment of this Court, to support the inference that Mr. Gray was in continuous possession of that handgun for a period exceeding six months when it was seized from him on March 8, 1994.
>
> The real world simply tells us, and all you have to do is read the newspaper every day to know, that handguns, unfortunately, change hands quite rapidly, particularly in the inner city.

Addressing Ward's identification of Gray as resembling one of his attackers, the district court stated, "to say that a young African American male in Baltimore City in 1993 and 1994 resembles another African–American male simply adds nothing in any rational way." The court, however, went on to conclude that the questioning of Gray on August 1 continued for some time, and "by the time [Gray] made the inculpatory statements, ... [there was] a thorough dissipation of any taint arising from the unlawful seizure of Mr. Gray." As the court summarized:

> The Court is satisfied ... that once there, with the combination of the *Miranda* warnings that were given to Mr. Gray, the absence of any showing of actual coercion practiced against or on Mr. Gray, the absence of any evidence of promises, threats or inducements to Mr. Gray, by the time he made the inculpatory statements concerning the Jessie Waller shooting, Mr. Gray's statements were free of any taint otherwise arising as a result of his detention and transportation.

The court also found that Gray "clearly understood" his *Miranda* rights and "knowingly and intelligently and voluntarily" waived them.

While the government continues to maintain on appeal that the officers had probable cause to arrest Gray on August 1, it argues that even if the arrest was unlawful, the statements that Gray made several hours later in a voluntary, non-coercive setting, following a waiver of his *Miranda* rights, were so causally attenuated from any coercion of the illegal arrest as not to have been tainted by it.

■ . We begin our analysis by determining first whether the government had probable cause to arrest Gray on August 1, 1994, because, if the arrest was supported by probable cause, we need not address the issue of attenuation.

■ ˙ " 'Probable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo,* 443 U.S. 31, 37, 99 S.Ct. 2627, 2632, 61 L.Ed.2d 343 (1979); *see also Adams v. Williams,* 407 U.S. 143, 148, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612 (1971). While probable cause requires more than "bare suspicion," it requires less than that evidence necessary to convict. *See Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949). It is an objective standard of probability that reasonable and prudent persons apply in everyday life. As the Court in *Brinegar* explained:

> In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. .

*Id.* Because probable cause is an objective test, we examine the facts within the knowledge of arresting officers to determine whether they provide a probability on which reasonable and prudent persons would act; we do not examine the subjective beliefs of the arresting officers to determine whether *they* thought that the facts constituted probable cause. *See Ornelas v. United States,* 517 U.S. 690, 116 S.Ct. 1657, 1661–62, 134 L.Ed.2d 911 (1996); *United States v. Han,* 74 F.3d 537, 541 (4th Cir.), *cert. denied,* 517 U.S.

1239, 116 S.Ct. 1890, 135 L.Ed.2d 184 (1996). The determination of whether given facts amount to probable cause *vel non* is a legal one that we review *de novo*. *See Ornelas*, 517 U.S. at ——, 116 S.Ct. at 1663. Of course, the factual determinations themselves are given deference. "[A] reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Id.*

The facts that arresting officers had within their knowledge in this case are undisputed. First, the FBI and state law enforcement officers had wiretap information that a "Fat David," which the officers believed was the street name of David Gray, had been involved in Waller's murder. Second, forensic evidence demonstrated that a pistol which Gray possessed had been used to fire 14 shots at the scene of the murder. And third, a witness identified Gray as resembling one of the assailants. These three facts, taken together, would readily lead a reasonable person to believe that it was probable that Gray was implicated in the murder. The first piece of information that officers had, the wiretap information, focused suspicion on Fat David. While this information supported only a suspicion and was insufficient to support a conviction, it directed the investigation solely to David Gray as a potential murderer of Black Jessie. When, several months after the murder, Gray was picked up with a handgun that turned out to be the same handgun which had fired 14 shots at Waller, the probability that Gray was criminally involved in the murder increased significantly. Finally, when one of the victims of the shooting picked Gray from an array of six persons, indicating that Gray's picture resembled his assailant, the probability increased yet more. We conclude, when considering together the three items pointing to Gray as one of the shooters, that the arresting officers objectively had probable cause.[1]

Gray argues that we should show deference to the district court's finding that handguns change hands quite rapidly, particularly in the inner city, and that, therefore, the mere possession of a handgun that was used in a murder several months earlier is not

---

1. The dissenting opinion, in arguing that we have applied a "spin" to the facts, selects isolated statements from the record, overlooking other portions of the record which undermine its selections. The dissent contends, for example, that the information on wiretaps did not make Gray a suspect but only "suggested that Gray might have information about the Waller murder." Agent Sheehy, however, stated that after he received the wiretap information linking Fat David with the Waller murder, and after he discussed the possibility with Agent Hill that Fat David might be David Gray, "we ... contacted the Homicide Unit ... to pass along this information that we believed that a possible person in the murder of Jesse Lee Waller could have been David Gray." J.A. at 292. Detective Sydnor testified similarly. *See* J.A. at 113–14. More importantly, Agent Sheehy testified that it was precisely this suspicion about Gray that formed the basis for comparing the ballistics test of shells taken from the murder scene with the gun seized from Gray. *See* J.A. 292–93. Indeed, Agent Sheehy explicitly testified, "As soon as we got the name [Gray's name], got the arrest record, and saw that the gun was—a gun was recovered from him, when we notified Homicide, within a couple of days is when they called to say, well, the gun was tested and in fact 14 of the 29 rounds are proven to have come from the same weapon." J.A. 330. The causative connection between the initial suspicion of Gray and the discovery that Gray's weapon was linked to the murder scene is thus well supported by the record.

The dissenting opinion also suggests that the fact that police found Gray only after looking for him for weeks was a "spin" because Detective Sydnor said he "never went looking for him[Gray]." Agent Sheehy testified, however, that after Homicide "had been unable to locate David Gray," it asked the FBI to assist. J.A. 296. The FBI thereafter made efforts to find Gray by, for example, staking out an intersection in East Baltimore where Gray was "known to hang out." J.A. at 297. Finally, it was through the FBI's efforts that it learned from Maryland State Police where Gray was on August 1.

Finally, the dissent attributes no probative value to Ward's identification of Gray made from a photo array because Ward stated that the photo of Gray only "resembled" one of the attackers. Detective Sydnor, however, testified that he watched Ward's eyes reviewing the array of photos and noticed that his eyes would stop on Gray's picture. As Detective Sydnor stated, "He [Ward] continued looking around and around, and his eyes would stop at David Gray's photo." J.A. at 227–28. When officers pressed Ward about any reluctance to make an identification, Ward confirmed, "Yeah, that resembled the guy." J.A. at 228. While Detective Sydnor may not have believed that such an identification was sufficiently definite to use to convict, he recognized its probative value, as did Agent Sheehy.

enough to establish involvement in the murder. Whether or not we accept the district court's conclusion that handguns change hands rapidly is ultimately of little import because that hypothesis was undermined by the other indicia of Gray's involvement. In this case, the arresting officers began with information from wiretaps that it was Gray who was involved in Waller's murder. When, based on that information, they directed their investigatory attention to Gray, they recovered from him the handgun that had actually been used at the scene. Finally, the arresting officers had additional corroborative information that one of the victims was able to identify Gray from a photo array as resembling his assailant. This combination of information raises a far greater probability of Gray's involvement than that derived from his mere possession of a handgun that had earlier been used in a crime.

Because we conclude that Gray's detention was supported by probable cause and was therefore legal, any statements that he made voluntarily after having been given *Miranda* warnings were admissible at trial.

▮ Gray contends, however, that his confession was not voluntary. He argues that his statements given on August 1 were coerced by use of a tactic which implied that any statements he made would not be used against him because the statements were made in furtherance of his prior and unrelated relationship to Agent Hill, who was present. Gray points out that Agent Hill was not a part of the investigatory team, but was there only to induce Gray to talk. As Gray makes the argument, "government agents cultivated this belief by consciously manipulating and exploiting agent Hill's relationship with Mr. Gray in a manner that increased the likelihood that Mr. Gray would submit to the coercive tactics."

With respect to this argument, the district court found that federal and state officers who interrogated Gray on August 1, before Detective Sydnor arrived at 1:40 p.m., may, indeed, have "'softened [Gray] up,' if you will," through small talk. The court explained, however, that not only was this tactic indicative of a comfortable, non-coercive atmosphere, but also that Gray was a sophis-

ticated young man and thought "he could talk his way around whatever subjects might come up." The court noted, however, that when Detective Sydnor, who was "clearly in charge of this investigation," arrived, Gray was "fully advised of his rights"; "he clearly understood them"; and "he knowingly and intelligently and voluntarily waived [them]." As the record demonstrates, Gray was told, among other things, that he did not need to answer any questions and that any answers that he gave thereafter could be used against him in court.

▮ We agree with the district court that there is nothing to indicate that Gray's statements were the product of coercion. A statement or confession is given voluntarily when it is the product of "free and unconstrained choice" of the person giving it. If the person's will is "overborne and his capacity for self-determination critically impaired," the statement or confession is not voluntary, and its use is prohibited. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225–26, 93 S.Ct. 2041, 2046–47, 36 L.Ed.2d 854 (1973).

The evidence in this case is overwhelming that Gray's statements, made after he was given his *Miranda* rights, were voluntary and that his will was not overborne when he was making them. First, Gray was given his *Miranda* rights before he gave any of the admitted testimony. He initialed his understanding of each of his rights and signed a form indicating that he understood his rights and that he was waiving them. Second, as the district court found, "in no way did the United States Attorney's office ... make any assurances, promises or inducements to Mr. Gray designed or reasonably likely to have the effect of convincing Mr. Gray that his activity in violent criminal offenses ... would in any way be immunized." Indeed, there is no evidence in the record to suggest that Gray believed in any way that his testimony would not be used against him. He was specifically told that his answers could be used against him when he waived his *Miranda* rights. Third, there is no evidence that the law enforcement officers in any way engaged in any threats, violence, or improper suggestions about how Gray's testimony would be used. And finally, when Gray did

request an attorney, the interview immediately ended. Thus, even considering the length of time spent at the police station, the evidence offers no indication that Gray's will was overborne. Rather, the evidence supports the district court's conclusion that the statements that Gray made after he had been read his rights were voluntary.

In summary, because we find that probable cause existed for Gray's arrest on August 1, 1994, and that Gray's statements given on that date were voluntary, the admission of these statements into evidence at trial was proper.

## III

Gray also contends that the government failed to present evidence sufficient to justify a jury's finding three elements of 18 U.S.C. § 1959(a) (punishing violent crimes in aid of racketeering activity)[2]: (1) the existence of an "enterprise," (2) its connection with interstate or foreign commerce, and (3) the existence of "racketeering." An "enterprise," as used in § 1959(a), is defined by 18 U.S.C. § 1959(b)(2) to include "any union or group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce." And a "racketeering activity" is defined by 18 U.S.C. § 1961(1) to include "any act or threat involving ... dealing in a controlled substance."

We review the verdict of a jury for sufficiency of evidence by determining whether "there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469–70, 86 L.Ed. 680 (1942). Moreover, "circumstantial evidence is treated no differently than direct evidence, and may be sufficient to support a guilty verdict even though it does not exclude every reasonable hypothesis con-

sistent with innocence." *United States v. Jackson,* 863 F.2d 1168, 1173 (4th Cir.1989).

As part of its proof that Gray violated 18 U.S.C. § 1959(a), the government needed to establish the fact that Gray was promised payment for the murder of Waller by an "enterprise." Such an enterprise may be any group of individuals associated in fact, and the earmarks of association are " 'continuity, unity, shared purpose, and identifiable structure.' " *United States v. Fiel,* 35 F.3d 997, 1003 (4th Cir.1994) (quoting *United States v. Griffin,* 660 F.2d 996, 1000 (4th Cir.1981)). The government must prove, moreover, that the enterprise was separate and apart from the association of Gray with the enterprise to murder Waller. *See Griffin,* 660 F.2d at 999.

In this case, the government presented evidence that a man named Ronald Whitener ran a drug distribution ring; that he had a lieutenant named Kip; that the organization had "stash houses"; and that Waller shot and robbed one of Whitener's stash house workers. From this evidence a jury could infer continuity from the existence of the stash houses. It could infer unity from the existence of a central leader, a lieutenant, and the existence of the stash house network. It could infer shared purpose from the testimony that the stash houses were used to distribute drugs. And it could infer identifiable structure from the existence of a leader, an assistant, stash house workers, and a system of stash houses. Based on this evidence, we believe that the government has presented substantial evidence that would allow a jury to conclude that Gray was dealing with an enterprise as that term is used in 18 U.S.C. § 1959(a).

The government was also required to show that the enterprise engaged in activities that affected interstate or foreign commerce. In this case, the government presented evidence that Jessie Waller, the

---

**2.** 18 U.S.C. § 1959(a), under which Gray was indicted, states, in relevant part:

> Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an *enterprise engaged in racketeering activity* ... murders, kidnaps, maims, assaults with a dan-

gerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished....

(Emphasis added).

murder victim, was a heroin user who had robbed one of Whitener's stash houses. The jury could thus reasonably infer that the stash houses contained heroin. The government also presented evidence that while the poppy seeds required to produce heroin are grown in Colombia, South America, the Far East, Southeast Asia, and Southwest Asia, they are not grown in Maryland. Although this evidence of the enterprise's connection with interstate commerce is not copious, we are satisfied that it is enough to meet the minimal standard required to satisfy the interstate commerce requirement of § 1959(b)(2). *Cf. United States v. Wilkinson*, 137 F.3d 214 (4th Cir.1998) (construing 18 U.S.C. § 1956); *United States v. Barton*, 647 F.2d 224, 231–32 (2d Cir.1981) (construing 18 U.S.C. § 844(i)); *United States v. Bagnariol*, 665 F.2d 877, 892–96 (9th Cir. 1981) (construing 18 U.S.C. § 1951, 1962(c)).

■ Finally, to satisfy its requirement of proving that the enterprise engaged in racketeering activity, the government could rely on the same evidence that it used to prove the existence of an enterprise because racketeering activity includes "any act or threat involving ... dealing in a controlled substance." *See* 18 U.S.C. § 1961(1). Thus, the evidence that the enterprise dealt in drugs would likewise be sufficient to support a jury finding that the enterprise engaged in racketeering.

Accordingly, we conclude that the jury verdict that Gray was dealing with an "enterprise engaged in racketeering activity" as used in § 1959(a) was amply supported by substantial evidence.

## IV

■ Gray next contends that the district court abused its discretion in failing to give a specific instruction to the jury on the credibility of perjurious witnesses because, he argues, Detective Sydnor perjured himself. Gray notes that at a pretrial motions hearing, Detective Sydnor testified that during the August 1 interrogation, Gray stated he had fired his gun 14 times during the shooting incident that resulted in Waller's death. At trial, however, Sydnor testified that he did not remember hearing Gray make that statement about 14 shots. Gray argues that this inconsistency entitled him to a special instruction on the care a jury should apply in scrutinizing perjurious testimony. In making this argument, Gray relies on *United States v. Wong*, 886 F.2d 252 (9th Cir.1989), which he contends supports the proposition that it is reversible error for a court which admits the testimony of a perjurer to fail to instruct the jury as to how to treat such testimony.

At the outset, it is not clear from the record that Sydnor perjured himself. During the pretrial hearing, Sydnor did state that on August 1, after he had brought to Gray's attention the forensic test which showed that 14 bullets had been fired from Gray's handgun, Gray changed some of the details of his testimony. As Sydnor testified, "At this time [Gray] admitted that yes, he was there, that he participated, he saw the victim and two other people walk into the alley, him along with Darty and Cox approached the victim. He stated that he fired his gun 14 times but he fired into a wall because he was afraid." Thus, Sydnor did testify that Gray said he had fired his handgun 14 times. But, this testimony might just as well have resulted from Sydnor's collapsing the information contained in the forensic report that Gray's handgun had been fired 14 times at the scene of the murder with Gray's admission that he was at the scene and in fact fired that gun into a wall because he was afraid. At trial, Detective Sydnor did not give any explanation for the discrepancy created by his failure to remember the substance of Gray's statement about 14 shots being fired except that he no longer recalled hearing such a statement. Sydnor stated that if the transcript showed that he had testified that way at the pretrial hearing, that is what he said. But he confirmed that at the time of trial, he did not have such a recollection. While the district court said it had a "lot of problems" with Detective Sydnor's testimony at the pretrial hearing, it expressly disavowed any suggestion that Sydnor had perjured himself. The court stated, "I don't want to be understood as suggesting that Detective Sydnor lied." The court did find Detective Sydnor's testimony

on various matters to be incoherent and inconsistent. But apart from the court's observations of this kind, there is no evidence that Detective Sydnor willfully misrepresented any facts or lied.

Even if Detective Sydnor had perjured himself, we believe that the district court's instructions to the jury were adequate to ensure fair consideration of the witness' credibility. Not only did the court give a range of jury instructions on witness credibility, but it also gave a specific instruction on the consideration of prior inconsistent statements. We believe that these instructions were adequate to meet an abuse of discretion standard. *See United States v. Russell*, 971 F.2d 1098, 1107 (4th Cir.1992).

The Ninth Circuit's decision in *Wong* does not suggest a different result. In *Wong*, the court held that a witness' admission that he lied under oath did not entitle the defendants to a special instruction regarding the witness' testimony. The court explained that "[t]he failure to give a perjury instruction is not reversible where the other instructions given by the trial court adequately cautioned the jury that the credibility [of the perjurer] is open to question." 886 F.2d at 257 (brackets in original; internal quotation marks omitted). Because the "trial court gave general instructions as to witness credibility and impeachment," *id.*, the court in *Wong* found that the jury was fully aware that it needed to consider witnesses' credibility, including the perjurer's credibility, with care. This case is no different. In light of the district court's broad range of instructions on credibility, we conclude that it did not abuse its discretion in refusing to give the specific instruction suggested by Gray.

## V

■ Finally, Gray contends that the United States Sentencing Commission's decision to impose a presumptive life sentence for violations of 18 U.S.C. § 1959(a)(1) was beyond its statutory authority.

Under U.S.S.G. § 2E1.3(a)(2), the Sentencing Guidelines provide that the offense level for a violent crime in aid of racketeering activity is the level applicable to the underlying unlawful conduct. In this case, the underlying crime, first-degree murder, is governed by U.S.S.G. § 2A1.1, which provides a base offense level of 43. The sentencing table indicates that for an offense level of 43, the sentence is life imprisonment. *See* U.S.S.G. Ch. 5, Pt. A.

Gray argues that the Sentencing Guidelines' direction of this presumptive sentence, without affording a range of sentences, is contrary to the authority granted by statute. He notes that Congress authorized sentences "not greater than necessary" for crimes, 18 U.S.C. § 3553(a), and that its presumptive imposition of life imprisonment removes all court discretion from sentencing decisions, contrary to the dictates of *Mistretta v. United States*, 488 U.S. 361, 374–75, 109 S.Ct. 647, 656–57, 102 L.Ed.2d 714 (1989), and *Koon v. United States*, 518 U.S. 81, ——, 116 S.Ct. 2035, 2053, 135 L.Ed.2d 392 (1996), which indicate that the Sentencing Guidelines must promulgate "ranges" and were not intended to withdraw all sentencing discretion from judges.

■ Gray also contends that his life sentence is invalid because it impermissibly infringed on his constitutional right to a jury trial by penalizing his decision to elect a jury trial rather than pleading guilty. He argues that had he simply pled guilty, he could have received a downward adjustment for acceptance of responsibility which would have reduced his offense level, authorizing, at a minimum, a sentencing range of 360 months to life, and therefore might have lowered his time in jail. He thus argues that his life sentence was imposed pursuant to an unconstitutional scheme.

Gray's arguments depend on two assumptions, both of which are inaccurate. They depend first on the assumption that judges have no discretion to sentence a defendant who violates § 1959(a)(1) to less than life imprisonment and, second, on the assumption that a defendant who insists on going to trial cannot receive a downward adjustment for acceptance of responsibility.

As to the first assumption, the Sentencing Guidelines authorize judges to adjust sentences downward for a range of reasons, such as substantial assistance to governmental au-

thorities and acceptance of responsibility. *See, e.g.,* U.S.S.G. §§ 5K1.1, 3E1.1. Sentencing judges may also make a downward departure when the Sentencing Guidelines fail to take into account a relevant mitigating factor. *See* 18 U.S.C. § 3553(b). Thus, sentencing courts still have discretion to impose a sentence less than life when *any* departure points have been subtracted from the offense level of 43. An offense level of 42, for example, authorizes a sentence of 360 months to life imprisonment. Gray's argument is further undermined by the fact that Congress itself contemplated that some guideline ranges would have the same minimum and maximum penalties. For instance, 18 U.S.C. § 3742(h) explains that for purposes of § 3742 (providing for a review of sentences), "the term 'guideline range' includes a guideline range having the same upper and lower limits."

As to Gray's second assumption, courts may adjust offense levels downwardly for acceptance of responsibility regardless of whether a defendant pleads guilty. The Sentencing Guidelines application notes make clear that "[c]onviction by trial ... does not automatically preclude a defendant from consideration for such a reduction." U.S.S.G. § 3E1.1, comment. (n.2).

Accordingly, we conclude that Gray's sentencing arguments rest on inaccurate predicates about the sentencing court's discretion and, therefore, fail for that reason.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*

MURNAGHAN, Circuit Judge, dissenting:

David Gray was convicted of murder in exchange for payment from a racketeering enterprise, 18 U.S.C. § 1959(a)(1), and of using a firearm in relation to a crime of violence, 18 U.S.C. § 924(c), largely on the basis of a confession made after his arrest. I believe that the arrest was not supported by probable cause, and the district court erred by denying Gray's motion to suppress his confession. The government contends, disagreeing with the district judge's finding, that the detention was supported by probable cause, and that, even if the arrest were unlawful, subsequent events sufficiently attenuated the taint so as to allow admission of the confession.

In its valiant efforts to find probable cause in this case, the *en banc* opinion is forced to spin and exaggerate the underlying facts. As the majority describes the supposed "three facts," which, "taken together, would readily lead a reasonable person to believe that it was probable that Gray was implicated in the murder," majority op. at 770, its exaggerations stray farther and farther from the truth. The truth, as the district judge realized, was that the arrest and interrogation were nothing more than a fishing expedition.

Because I believe that Gray's arrest was not supported by probable cause and no circumstances removed the taint of the illegal arrest, I respectfully dissent.

## I.

### A.

To comply with the Fourth and Fourteenth Amendments, an arrest must be predicated on probable cause. *See Papachristou v. City of Jacksonville,* 405 U.S. 156, 169, 92 S.Ct. 839, 847, 31 L.Ed.2d 110 (1972). The probable cause requirement applies to custodial interrogations as well as formal arrests. *See Dunaway v. New York,* 442 U.S. 200, 216, 99 S.Ct. 2248, 2258–59, 60 L.Ed.2d 824 (1979). "Probable cause exists when the facts and circumstances known to the officer 'would warrant the belief of a prudent person that the arrestee had committed or was committing an offense.'" *Taylor v. Waters,* 81 F.3d 429, 434 (4th Cir.1996) (quoting *United States v. Garcia,* 848 F.2d 58, 59–60 (4th Cir.1988)). "In assessing the existence of probable cause, courts examine the totality of the circumstances known to the officer at the time of the arrest." *Id.* (citing *United States v. Al–Talib,* 55 F.3d 923, 931 (4th Cir.1995)). "Probable cause must be supported by more than a mere suspicion, but evidence sufficient to convict is not required." *Id.* (citing *Wong Sun v. United States,* 371 U.S. 471, 479, 83 S.Ct. 407, 413, 9 L.Ed.2d 441 (1963)).

In evaluating *de novo* whether the facts amounted to probable cause, we are to "give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Ornelas v. United States*, 517 U.S. 690, ——, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996). This does not mean that we are to defer to the judge's or officers' belief about whether they possessed probable cause or not. The probable cause inquiry is an objective one, asking what reasonable officers would have believed: even if the actual officers did not believe they had probable cause, we will uphold the arrest if the "evidence was sufficient to support such a reasonable belief." *United States v. Han*, 74 F.3d 537, 541 (4th Cir.), *cert. denied*, 517 U.S. 1239, 116 S.Ct. 1890, 135 L.Ed.2d 184 (1996). However, a "trial judge views the facts of a particular case in light of the distinctive features and events of the community.... The background facts provide a context for the historical facts, and when seen together yield inferences that deserve deference." *Ornelas*, 517 U.S. at ——, 116 S.Ct. at 1663.

### B.

The *en banc* majority finds probable cause for Gray's arrest from the wiretap "information," ballistics evidence and a so-called identification. The district court found to the contrary. I believe that the three leads relied on by the *en banc* majority, even taken together, were no more than bases for suspicion. But for the *en banc* opinion's exaggerating spin, it would be clear that none contributed enough to establish probable cause.

### 1.

The *en banc* opinion begins by describing supposed wiretap "information" that "focused suspicion" and "directed the investigation" to Gray:

First, the FBI and state law enforcement officers had wiretap information that a

"Fat David," which the officers believed was the street name of David Gray, had been involved in Waller's murder.... The first piece of information that the officers had, the wiretap information, *focused suspicion* on Fat David. While this information supported only a suspicion and was insufficient to support a conviction, it *directed the investigation solely to David Gray* as a potential murderer of Black Jessie.

Majority op. at 769–770.

In truth, the wiretap lead was so vague as to be insignificant in contributing to probable cause.[1] There are doubtless many Davids, even corpulent ones, in the Baltimore area other than David Gray. The most that can fairly be said about the wiretap "information" was that "the way we [the FBI agents] interpreted the [wiretapped] conversation" was that "the name Dave or David [was] used in reference to individuals related to the killing of Jesse [Waller]." (J.A. at 288 (direct examination of Agent Sheehy).) FBI Agent Hill suggested the name of David Gray "as being a possible name for the Fat David or David that we [the FBI agents] had had reference to in the conversations." (*Id.* at 289.) The state law enforcement officer in charge of the murder investigation, Detective Sydnor, knew only that

[t]hey had—someone had a wire tap, I understood, and Jesse, Black Jesse's name had come up, also David Gray's name had come up, and whatever reason they had put those two together, at which time for whatever reason they notified [my superior] who in fact said, well, Marvin [Sydnor] has a case with a Black Jesse that is involved, at which time I spoke with them and we started putting two and two together.

(J.A. at 139 (cross-examination of Detective Sydnor).) As Detective Sydnor explained, this wiretap lead suggested that Gray might have information about the Waller murder, but did not establish Gray as a suspect:

---

1. It was not mere oversight nor coincidence that the supposed "wiretap information" was wholly ignored by the arresting officers in their explanation of their basis for believing that they had probable cause, (J.A. at 259 (redirect examination of Detective Sydnor)), by the district judge in his finding that there was no probable cause for the arrest, (J.A. at 500–02 (ruling on suppression motion)), and by the government in its meager defense of the arrest, *see* Brief of Appellee at 12–13.

Q: Now, you said that it was in April of '94 that you first developed Mr. Gray as a suspect; is that right?

A: No, I don't think I said that. I said in late April is when it was brought to my attention that he might have information concerning, Mr. Gray may have information concerning this investigation.

(*Id.* at 136.) Detective Sydnor was adamant about this point:

Q: [Y]ou developed suspicions about Mr. Gray in April of '94; correct?

A: Yes.

Q: All right [sic]. And that was in relationship—

A: Wait a minute, wait a minute, wait a minute. No, no. Repeat that again, please?

Q: Okay. You learned of Mr. Gray's identity as someone who might have information in April of '94?

A: Yes, that is correct.

(*Id.* at 138.)

2.

The next "fact" relied upon by the *en banc* opinion is the ballistics evidence. About five months after the murder, Gray was arrested in possession of a handgun that ballistics tests demonstrated was fired during the murder. However, there was no evidence suggesting when or how Gray had obtained the gun. The district court found that:

The temporal nexus between the October shooting and the March 8th seizure of the gun from Mr. Gray is simply not sufficient, in the judgment of this Court, to support the inference that Mr. Gray was in continuous possession of that handgun for a period exceeding six months[2] when it was seized from him on March 8, 1994.

The real world simply tells us, and all you have to do is read the newspaper every day to know, that handguns, unfortunately, change hands quite rapidly, particularly in the inner city. They change hands because of burglaries, because of

thefts, because of illegal sales and because of legal sales.

(J.A. at 501 (ruling on suppression motion).)

The trial judge's rejection of the inference, that because Gray possessed the gun in March it was reasonably likely that he had used it in October, was informed by his knowledge of background facts about the Baltimore community in which he lives and practices. The Supreme Court has recognized that a trial judge views the facts through a lens of knowledge of the community, *see Ornelas,* 517 U.S. at ——, 116 S.Ct. at 1663 ("The background facts, though rarely the subject of explicit findings, inform the judge's assessment of the historical facts."), and has explained to us that these "inferences ... deserve deference," *id.* "[A] reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Id.*

Instead of obeying the Supreme Court's directive, the *en banc* court merely repeats the other "facts" that it believes supported probable cause, and asserts that the "combination of information raises a far greater probability of Gray's involvement than that derived from his mere possession of a handgun that had earlier been used in a crime." Majority op. at 771. In order to create something out of nothing, however, the *en banc* opinion is forced further to recharacterize and spin the facts. The wiretap lead, which suggested only that someone named David might have useful information about the murder, is now described as "information from wiretaps that it was Gray who was involved in Waller's murder." Majority op. at 771. And the *en banc* opinion characterizes the uncertain results of a photo array selection as "additional corroborative information," a claim no closer to the truth. *Id.*

3.

The third "fact" relied upon by the *en banc* opinion to establish probable cause is the photo array "identification." The two surviv-

[2] In fact there were slightly less than five months between the October 19, 1993, shooting and the March 8, 1994, arrest.

ing victims of the shooting were shown a photo array, which included a photograph of Gray, and were asked to try to identify their attackers. One of the victims, Antoine Little, could not identify anyone from the array. The other, Tracy Ward, "looked at it [the array] and reluctantly said yeah, this guy resembles the guy." (J.A. at 228 (cross examination of Detective Sydnor).) "Resembled" was the term actually used by Ward. (*Id.* at 230–31.) Detective Sydnor did not believe that this was a positive identification. (*Id.* at 228.) In fact, he used the word "reluctantly" to distinguish it from a more certain identification:

> Q: You say reluctantly. What do you mean by reluctantly?
>
> A: Well, there's some people you'll give the photo card, that's the person, that's the person. He didn't do that. He looked and he was—look in his eye, again was looking at Gray's photo, and said yeah, that resembles the guy.

(*Id.*) After this reluctant selection, a photograph was again shown to Little, but he still could not identify Gray. (J.A. at 116 (direct examination of Detective Sydnor).)

The district court properly characterized these events as an "exceedingly tentative identification." (J.A. at 502 (ruling on suppression motion).) I agree that the identification "adds absolutely nothing to the probable cause equation." *Id.* However, the *en banc* opinion exalts this identification to the level of "additional corroborative information," combining with the other "facts" to support probable cause. Majority op. at 771.

### 4.

The police officers in this case began with mere speculation and guesswork about vague hints in a wiretapped conversation. They gathered some ballistics evidence, but its timing undermined its usefulness. To this they added an identification so tentative as to be practically worthless. Although piecing

together these three clues was a good first step,[3] the officers should have followed up their hunches with more investigation. Because those hunches did not amount to probable cause, the warrantless arrest was illegal. "Arresting a person on suspicion, like arresting a person for investigation, is foreign to our system" and is not acceptable behavior. *Papachristou,* 405 U.S. at 169, 92 S.Ct. at 847.

The Supreme Court "has required that the existence of probable cause be decided by a neutral and detached magistrate whenever possible." *Gerstein v. Pugh,* 420 U.S. 103, 112, 95 S.Ct. 854, 862, 43 L.Ed.2d 54 (1975). Here there were no exigent circumstances requiring a warrantless arrest. There was no suggestion that all magistrates were unavailable. The police had ample opportunity to apply for a warrant from a judicial officer. When the police officers decided not to seek a warrant, but "to go get [Gray], bring him in, interview him, see what he had to say," (J.A. at 304 (direct examination of Agent Sheehy)), they violated his rights guaranteed by the Fourth and Fourteenth Amendments. Because the police did not have probable cause to believe Gray had been involved in the crime, his arrest for the purpose of interrogation was unlawful. *See Davis v. Mississippi,* 394 U.S. 721, 726–27, 89 S.Ct. 1394, 1397–98, 22 L.Ed.2d 676 (1969). In this regard I agree with the district judge's conclusion.

### II.

Having erroneously found probable cause for the arrest, the *en banc* opinion does not even address the next question—whether the confession is admissible despite the unlawful arrest because the taint of the arrest had been dissipated by the time Gray confessed. That is the point on which the district court relied to admit the confession. However, it is a legal determination subject to *de novo* review. I believe that the confession is inad-

---

**3.** At least, in general, the police work was tenacious, although not as good as the majority seems to think. The majority claims that the police found Gray only "[a]fter looking for him unsuccessfully for weeks." Majority op. at 768. However, Detective Sydnor testified that he

"never, never went looking for him [Gray]," despite his supposed belief that there was probable cause to arrest Gray for murder. (J.A. at 262 (redirect examination of Detective Sydnor).) In fact, the district judge was baffled at this apparent dereliction of duty. (*Id.* at 260–62.)

missible because the taint was not sufficiently dissipated.

When a confession is the fruit of an illegal arrest, the exclusionary rule prevents the prosecution from introducing it into evidence "un less intervening events break the causal connection between the illegal arrest and the confession so that the confession is sufficiently an act of free will to purge the primary taint." *Taylor v. Alabama*, 457 U.S. 687, 690, 102 S.Ct. 2664, 2667, 73 L.Ed.2d 314 (1982) (internal quotation omitted); *see also Dunaway v. New York*, 442 U.S. 200, 217–18, 99 S.Ct. 2248, 2259–60, 60 L.Ed.2d 824 (1979); *Brown v. Illinois*, 422 U.S. 590, 602, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975). Although the question of whether the taint has been purged turns on the individual facts of each case, the Supreme Court has established an analytical framework to guide courts making that determination. *See Brown*, 422 U.S. at 603–04, 95 S.Ct. at 2261–62. As a threshold matter, in order to be admissible, the confession must be voluntary within the meaning of the Fifth Amendment, but voluntariness is, by itself, insufficient to attenuate the taint of an illegal arrest. *See Taylor*, 457 U.S. at 690, 102 S.Ct. at 2666–67; *Dunaway*, 442 U.S. at 217, 99 S.Ct. at 2259; *Brown*, 422 U.S. at 604, 95 S.Ct. at 2262. *Miranda* warnings may indicate that a confession is voluntary for the purpose of the Fifth Amendment, but such warnings do not remove the taint of an illegal arrest. *See Dunaway*, 442 U.S. at 217, 99 S.Ct. at 2259; *Brown*, 422 U.S. at 602–03, 95 S.Ct. at 2261–62.

If the confession was voluntary, the next step which must be addressed is to determine whether the causal connection between the arrest and the confession was broken, paying particular attention to the factors set forth in *Brown:* "the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." *Brown*, 422 U.S. at 603–04, 95 S.Ct. at 2261–62. If these factors indicate that the confession was obtained by exploitation of the unlawful arrest, the confession must be suppressed. *Id.* at 600–04, 95 S.Ct. at 2260–62. The prosecution bears the burden of demonstrating that the confession is admissible. *Id.* at 604, 95 S.Ct. at 2262.

As the district court properly held, Gray's confession meets the threshold requirement of voluntariness. He confessed after the officers explained his *Miranda* rights and after he knowingly and intelligently waived those rights. Although some of the officers talked with Gray before the *Miranda* warnings were administered, the district court found, as a factual matter, that they merely engaged in small talk and did not discuss the Waller murder. Also, the district court excluded all statements made before Gray waived the *Miranda* warnings.

Because the confession was given voluntarily, I move on to examine the factors set forth in *Brown*. This examination reveals that the confession was obtained by exploitation of the illegal arrest. First, the confession was made in close temporal proximity to the arrest, coming less than three hours after Gray was arrested. *See, e.g., Taylor,* 457 U.S. at 691, 102 S.Ct. at 2667–68 (excluding confession made six hours after illegal arrest); *cf. Wong Sun v. United States,* 371 U.S. 471, 491, 83 S.Ct. 407, 419, 9 L.Ed.2d 441 (1963) (admitting unsolicited confession made voluntarily several days after illegal custody ended).

Next, no intervening events of any significance broke the causal connection between the arrest and the confession. Before Gray made the confession, he was not released from illegal custody. *See id.* (finding release from custody to be an attenuating intervening circumstance). Nor did he consult with counsel. *See Carnejo–Molina v. I.N.S.,* 649 F.2d 1145, 1149 (5th Cir.1981) (finding consultation with counsel to be an attenuating intervening circumstance). Instead, he was simply brought to the police station, informed of his rights,[4] and interrogated.

Finally, the investigators' misconduct in this case is indistinguishable from the misconduct at issue in *Dunaway* and *Taylor*. In

---

4. As explained above, the giving of *Miranda* warnings is not a significant intervening event.

*See Taylor*, 457 U.S. at 691, 102 S.Ct. at 2667–68.

this case, as in those cases, "the police effectuated an investigatory arrest without probable cause ... and involuntarily transported petitioner to the station for interrogation in the hope that something would turn up." *Taylor,* 457 U.S. at 693, 102 S.Ct. at 2668–69. Arrests made for investigatory purposes without probable cause are precisely the type of police misconduct prohibited by *Brown* and its progeny. *See Dunaway,* 442 U.S. at 215, 99 S.Ct. at 2258; *Brown,* 422 U.S. at 605, 95 S.Ct. at 2262–63.

The government attempts to distinguish this case from Supreme Court precedent on three grounds: the police did not employ coercive interrogation methods, Gray's sophistication makes it more likely that his confession was an act of free will, and the police believed in good faith that they had probable cause to detain Gray. None of these facts, whether considered separately or cumulatively, demonstrate a break in the causal connection between the arrest and the confession. Gray's sophistication and the absence of coercive interrogation methods merely support the conclusion, which I have already reached, that the confession was made voluntarily. As previously stated, although voluntariness is a threshold requirement of admissibility, it is by itself insufficient to show a break in the causal connection between the arrest and the confession. *Dunaway,* 442 U.S. at 219, 99 S.Ct. at 2260. As the Court put it in *Taylor,* "[t]he fact that police did not physically abuse petitioner, or that the confession they obtained may have been 'voluntary' for purposes of the Fifth Amendment, does not cure the illegality of the initial arrest." 457 U.S. at 693, 102 S.Ct. at 2668.

The government does not explain, and I do not see an explanation, how the officers' good faith interrupts the causal connection between the illegal arrest and the confession. It is well established that the officers' subjective state of mind does not affect whether an arrest was lawful. *Beck v. Ohio,* 379 U.S. 89, 97, 85 S.Ct. 223, 228–29, 13 L.Ed.2d 142 (1964). In addition, the Supreme Court has expressly declined to adopt a good faith exception to the exclusionary rule in this context. *Taylor,* 457 U.S. at 693, 102 S.Ct. at 2668–69.

Because all three of the *Brown* factors weigh against the government, the causal connection between the illegal arrest and the confession was not sufficiently attenuated to permit the admission of the confession. In *Taylor,* the Court observed: "This case is a virtual replica of both *Brown* and *Dunaway.* Petitioner was arrested without probable cause in the hope that something would turn up, and he confessed shortly thereafter without any meaningful intervening event." 457 U.S. at 690–91, 102 S.Ct. at 2666–68. The same is true of Gray's case.

III.

For the foregoing reasons, I respectfully dissent.