**UNITED STATES of America**

v.

**David ANDINO, Defendant.**

**No. S1397CR.1293(MGC).**

United States District Court,
S.D. New York.

May 15, 2000.

172

Mary Jo White, United States Attorney for the Southern District of New York, New York City, by Richard C. Daddario, Nicole A. LaBarbera, Assistant United States Attorneys, for United States of America.

Sanford M. Katz, New York City, for Defendant.

## OPINION & ORDER

CEDARBAUM, District Judge.

This case involves a little used provision of the federal racketeering laws, the "murder for hire" portion of 18 U.S.C. § 1959(a). Defendant David Andino is charged with conspiring and attempting to commit murder in violation of § 1959(a). He is also charged with using and carrying a firearm in the commission of those crimes. All three charges are based on a single occurrence in March 1994 in which the defendant allegedly helped members of a drug gang called Sex, Money and Murder (hereafter "SMM") to locate and shoot Domingo Osorio, commonly referred to as "Totito," in exchange for money from the gang. Andino was not a member or associate of the gang.

At the close of the government's case, Andino moved for a judgment of acquittal pursuant to Fed.R.Crim.P. 29(a). When the defense rested, Andino renewed his

earlier motion. Each time, I reserved decision on the motion. The jury deliberated for three days but eventually deadlocked nine to three for acquittal. Both the government and the defendant consented to a mistrial. Andino then renewed his motion for a judgment of acquittal pursuant to Fed.R.Crim.P. 29(c).

A careful review of the trial record shows that there is insufficient evidence that Andino expected or received money from SMM for his participation in the attempt to murder Totito. Since payment or a promise to pay from an enterprise engaged in racketeering activity is an essential element of the crimes charged in the indictment, the motion for a judgment of acquittal is granted.

## THE STANDARD

Fed.R.Crim.P. 29(a) provides that "[t]he court on motion of a defendant or on its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses." Decision on a motion for judgment of acquittal may be reserved until the jury is discharged. Fed.R.Crim.P. 29(b). After the jury is discharged, a defendant may renew the motion. Fed. R.Crim.P. 29(c). In reviewing the renewed motion, a court will consider only the evidence that was in the record at the time decision was reserved. Fed. R.Crim.P. 29(b).

Moreover, in reviewing a motion for judgment of acquittal, the evidence in the trial record must be viewed in the light most favorable to the government. *United States v. Zagari,* 111 F.3d 307, 327 (2d Cir.1997). A Rule 29 motion must be denied if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *see also* *United States v. Labat,* 905 F.2d 18, 22 (2d Cir.1990).

## THE EVIDENCE

Viewed in the light most favorable to the government, the evidence at trial established the following facts.

From 1993 to 1995, John Castro was a drug dealer who supplied drugs to members and associates of SMM. Castro also supplied drugs to customers who were not connected with SMM. In early 1994, Castro negotiated a drug transaction with an individual named Alan Smith. Smith, who had no connection with SMM, approached Castro seeking to purchase two kilograms of cocaine to transport to Virginia. When Castro replied that he did not have any cocaine at that time, Smith suggested that Castro buy the cocaine from an individual named "Totito" (whose real name was Domingo Osorio) and provide it to Smith. In exchange, Smith would pay Castro extra money after he sold the drugs.

Castro agreed, and Smith arranged a meeting with Totito. After Castro gave Totito a bag of money, Totito left, promising to return after he counted the money. However, Totito never returned.

Castro called Yero Pack, Andre Martin, and Peter Rollack for help in locating Totito. Pack and Rollack were "members" of SMM, while Martin and Castro were considered "associates." After meeting in the Parkchester area of the Bronx, they questioned Smith as to Totito's whereabouts. Smith offered to show Castro where Totito lived. The group went to Totito's father's home, but Totito was not there.

After that night, Castro continued his search for Totito. Castro spoke to a number of SMM members about finding Totito, specifically Pack, Rollack, and another member known as "Twin." Castro also spoke to a number of individuals who were not members of SMM, including Martin, "Adonis," "Pop," and many others. At some point, Castro spoke to Andino about Totito. Andino was neither a member nor

an associate of SMM. Andino told Castro that he knew who Totito was.

On the evening of March 9, 1994, Castro, Pack, and Rollack picked up Andino on Theriot Avenue in the Bronx. Andino told the others that he had heard that Totito was in the Bronx River Housing Project. They drove to the Bronx River Housing Project and saw Totito's car double-parked on 174th Street. They drove past the car and pulled over around the corner. Pack opened a hidden compartment in the vehicle and took out three guns. Andino, Castro, and Rollack each took a gun and exited the vehicle.

As they approached Totito's car, Andino told Castro that Totito was sitting in the car's front passenger seat. Castro started firing his gun toward the passenger seat, and Andino started shooting as well. Totito's car started to roll away from where it was parked. As it rolled, Rollack ran into the street and started shooting. The car's engine started and the car drove away. After the car was gone, Andino, Castro, and Rollack got back into their vehicle where Pack was waiting. Andino told them that he believed he had hit Totito.

The group then decided to contact local hospitals to find Totito and kill him if he were still alive. Andino made a telephone call and learned that Totito was at Jacobi Hospital and that Totito had been wearing a bulletproof vest. They went to Jacobi Hospital, but left without trying to kill Totito because they learned that there were police officers in the hospital and an attack would be too risky.

A few weeks later, Andino complained to Pack that he wanted to "get paid" and expressed his fear that Castro had him "locked." (Tr. 283.) Andino asked Pack for help in contacting Castro. On one occasion after the shooting but before early April, Andino went to Castro's store and "told [Castro] that he needed some money,

that [Castro] had to look out for him because Totito had recognized him that night that [they] had shot him." (Tr. 97.) Andino also told Castro that he knew that he had shot Totito because he had heard that a .45 caliber bullet was removed from Totito and Andino had used a .45 pistol on the evening of the shooting. Castro gave Andino between $1000 and $1500.

A month or two later, Totito shot and wounded Andino. Castro spoke to Andino by telephone while Andino was in the hospital and told him not to worry. Castro told Andino that he would take care of the problem. After being released from the hospital, Andino went to see his cousin Dennis Del Toro at Del Toro's home in the Bronx. Andino was wearing a bulletproof vest and had a gun in his waistband. Andino told Del Toro that he was looking for someone to help him kill Totito.

In August 1994, Totito was murdered. Rollack took credit for the killing and Castro paid him approximately $5000. Andino had no involvement in Totito's death.

## DISCUSSION

Andino is charged in two counts of the indictment with violating 18 U.S.C. § 1959(a), which provides in relevant part:

> Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity ... murders ... any individual ... or attempts or conspires to do so ... shall be punished....

This portion of § 1959(a) is sometimes referred to as the statute's "murder for hire" provision. This case is unusual in that Andino is not also charged under the statute's "status murder" provision, which requires that the defendant have acted to enhance his position within or gain entry into a racketeering enterprise.[1]

---

1. Defendants are infrequently charged under the "murder for hire" portion of § 1959(a). Only a handful of published opinions contain

any discussion of this provision. *See United States v. Concepcion,* 983 F.2d 369, 384 (2d Cir.1992); *United States v. Gray,* 137 F.3d

To convict a defendant under the "murder for hire" provision of § 1959(a), the government must prove that the defendant was paid or promised payment for attempting or conspiring to commit murder. The government must also prove that the payment or promise of payment was received from an enterprise engaged in racketeering activity. In this case, the government is required to prove that Andino received payment or a promise of payment from SMM. The government presented its case on the theory that Andino expected to be paid, and was paid, by John Castro. It was thus necessary for the government to prove that John Castro acted on behalf of SMM when he gave money to Andino. Put differently, in order for the payment to have been received from the enterprise, Castro must have been acting as an agent of the enterprise, not in his personal capacity, when he made the payment to Andino.[2]

Since Castro is the purported agent of SMM in this case, his testimony is the most important. Castro testified that he was "not actually a member" of SMM, but was rather "associated with them." (Tr. 64.) Specifically, his connection with the enterprise was that he "supplied them with drugs." (Tr. 62.) Castro testified that he had personal relationships with some members of SMM. However, he did not testify that he had ever acted on the organization's behalf or that he ever acted to protect an organizational interest distinct from his own personal interest.

The genesis of Castro's desire to retaliate against Totito was a deal between Castro and Alan Smith, a deal that Castro admitted "had nothing to do with SMM." (Tr. 141.) Castro's testimony shows that the search for Totito and the attempt on his life was solely to revenge John Castro. Although Castro recruited some SMM members to help him, the venture itself was not an SMM activity. Once Castro learned that Totito had run off with his money, he offered a bounty for anyone who could provide information on Totito's whereabouts. Castro's inquiries were not limited to members and associates of SMM. While Castro testified that he spoke to individuals associated with SMM about finding Totito, he also spoke with many others not associated with SMM. He "was asking a lot of people" to help him find Totito. (Tr. 148.)

When Castro was asked about the role others played in his search for Totito, he did not give any indication that he considered the search to be an SMM activity. In fact, he made it clear that he considered retaliation against Totito to be his own problem and his own responsibility. He indicated the personal nature of his campaign when he testified, "I don't know if [anyone else was] looking for him ... I was asking. I was doing the. looking." (Tr. 148–49.) When given an opportunity on cross-examination to distinguish SMM's interest in the search for Totito from his own personal interest, he failed to do so:

Q. The whole point of the exercise was for you to find him, right, it was your money, right?

A. Initially, yes.

---

765, 772 (4th Cir.1998); *United States v. Ferguson*, 49 F.Supp.2d 321, 328–29 (S.D.N.Y. 1999). In only one of these cases was the defendant charged under this provision alone. *See Gray*, 137 F.3d at 772 (upholding § 1959(a) conviction where defendant had been approached by the head of a criminal enterprise with an offer of $5000 for the life of the person who had robbed and killed a worker in one of the enterprise's stash houses).

2. During its deliberations, the jury asked, "[c]ould we get a clarification of 'receiving money from the *enterprise.*' Could getting money from an individual be just that as opposed to getting money from an enterprise." (Ct.Exh. 3.) (emphasis in original) As agreed by both sides, I instructed the jury that "[a]n enterprise, like any other corporate entity, operates through individuals. Receiving money from Sex, Money, and Murder, the enterprise, means receiving money from a person who is acting on behalf of the enterprise." (Tr. 828.)

Q. What do you mean, initially? Did anyone else lose money?

A. I don't understand the question. Are you asking me at that particular moment did I set out prior to our running into him, if that was the whole object?

Q. Yes.

A. I don't recall that as the reason that we were together.

Q. Do you recall any reason why you were together?

A. No, I don't.

Q. Isn't it a fact that you were so angry—not on that day—you were pretty angry with Totito, you were ripped off?

A. Yes, I was.

(Tr. 155.) It is significant that Castro, the purported agent of SMM, could provide no reason why he did anything with Pack and Rollack other than his own interest in finding Totito. Castro drove this point home when he was asked why Pack brought Rollack and Andino along to look for Totito by responding "[t]hey happened to all be together, I guess." (Tr. 147.) There is thus no evidence in Castro's testimony that he paid Andino on behalf of SMM. Indeed, there is no evidence in his testimony that the search for Totito was an SMM activity at all.

The government relies heavily on Pack's testimony to show that the search for Totito was an enterprise activity. Pack testified that he wanted Totito killed because Totito had "embarrassed the organization." (Tr. 392.) He also claimed that "[b]y embarrassing Castro he was embarrassing all of us." (*Id.*) This testimony, the government argues, shows that the search for Totito was an SMM activity, and from this premise, the government argues that Castro's payment to Andino was in effect a payment by SMM.

However, regardless of Pack's motivation in helping Castro, Pack did not pay Andino—Castro did. And the money stolen by Totito was stolen from Castro in a drug transaction that had no connection with SMM. The government does not dispute that to obtain a conviction under § 1959(a) it must prove that the defendant received payment or a promise of payment "from" the enterprise. Even if Pack's testimony that he intended the search for Totito to benefit SMM is credited, it does not show that the payment received by Andino was made by SMM. Put differently, if Castro organized the search for his personal purposes and paid Andino out of his own pocket for Andino's participation, it is irrelevant that Pack considered the search to be a response to a threat to the organization. Pack's testimony shows, at best, that SMM was acting on behalf of John Castro, not the converse as required by § 1959(a).[3] Moreover, there is no evidence that any member of the enterprise, let alone Castro, possessed authority to make payments on the enterprise's behalf.

The Fourth Circuit's decision in *United States v. Gray*, 137 F.3d 765 (4th Cir.1998), illustrates the kind of evidence that is lacking in this case. In *Gray*, the defendant was convicted under the "murder for hire" provision of § 1959(a) and challenged on appeal the sufficiency of the evidence proving that he received payment from a racketeering enterprise. The court upheld the defendant's conviction because there was evidence that the enterprise at issue, a drug distribution organization, had "identifiable structure" and that the defendant was hired and paid by the leader of the organization. *Id.* at 772–73. In addition, the defendant was paid to kill an individual who had robbed and killed a worker in one of the organization's stash houses, a direct concern to the organization as an enterprise. Although there is evidence in the present case that Castro was an "associ-

---

**3.** It should be noted that when Rollack, a member of SMM, later claimed credit for killing Totito, Castro paid him $5000.

ate" of SMM and supplied the gang with drugs, there is no evidence that he performed in a leadership or agency capacity like the "central leader" or "lieutenant" in *Gray. Id.* Moreover, it is uncontested that the robbery for which Castro sought revenge had no connection with the drug activities of SMM.

In sum, the government provided insufficient evidence that Castro acted on behalf of SMM when he gave Andino money for his participation in Castro's attempt to murder Totito. The evidence in the record shows only that some members of SMM acted on behalf of Castro in the course of the events charged in the indictment. A rational trier of fact could not conclude beyond a reasonable doubt that Andino expected or received payment from SMM as consideration for his participation in the conspiracy and attempt to murder Totito. Thus, an essential element of the § 1959(a) charges was not proved.

In addition to two counts under § 1959(a), Andino is charged with one count under 18 U.S.C. § 924(c) of using and carrying a firearm during and in relation to the attempt and conspiracy to murder Totito. Because the firearm count is predicated on commission of a crime charged in one or both of the two other counts, acquittal of the § 1959(a) charges requires acquittal of the § 924(c) charge.

Andino raises two other substantial issues in support of his motion. First, he seeks reconsideration of a question I tentatively resolved in the government's favor during trial: whether, under the "murder for hire" provision of § 1959(a), a defendant must know that he is being paid by a racketeering enterprise, or whether payment by such an enterprise is a jurisdictional element of which the defendant need not be aware. Since it is undisputed that there is no evidence that Andino was aware of the existence of SMM, he argues that the government failed to prove an element of the crime charged. Second, he contends that there is insufficient evidence in the record that he expected to receive payment from SMM (or even Castro) before the attempt to kill Totito. Without evidence that he expected payment, Andino argues, money received after the fact was not received "as consideration" for his earlier conduct as required by § 1959(a). Although these are issues of significance, it is unnecessary to reach them in view of my determination that the evidence at trial was not sufficient to prove beyond a reasonable doubt that Andino received payment or a promise of payment "from" SMM as required by § 1959(a).

## CONCLUSION

For the foregoing reasons, Andino's Rule 29 motion for a judgment of acquittal is granted.

SO ORDERED.