PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

BRENDA S. PARK; TONY D. PARK,
  *Plaintiffs-Appellees,*

v.

STEPHEN R. SHIFLETT; JEFF SIMMS,
  *Defendants-Appellants.*

No. 00-1809

Appeal from the United States District Court
for the Western District of Virginia, at Charlottesville.
B. Waugh Crigler, Magistrate Judge.
(CA-99-39-3)

Argued: January 23, 2001

Decided: May 17, 2001

Before WIDENER and TRAXLER, Circuit Judges, and
Malcolm J. HOWARD, United States District Judge for the
Eastern District of North Carolina, sitting by designation.

---

Affirmed in part and reversed in part by published opinion. Judge
Howard wrote the majority opinion, in which Judge Widener joined.
Judge Traxler wrote an opinion concurring in part and dissenting in
part.

---

## COUNSEL

**ARGUED:** Anton Joseph Stelly, THOMPSON, SMITHERS, NEW-
MAN, WADE & CHILDRESS, Richmond, Virginia, for Appellants.
Thomas E. Albro, TREMBLAY & SMITH, L.L.P., Charlottesville,

Virginia, for Appellees. **ON BRIEF:** Peter J. Caramanis, TREM-
BLAY & SMITH, L.L.P., Charlottesville, Virginia, for Appellees.

## OPINION

HOWARD, District Judge:

Appellants Stephen R. Shiflett and Jeff Simms appeal the decision
of the magistrate judge awarding appellees Brenda S. Park and Tony
D. Park $450,000 and $50,000 respectively. We affirm in part and
reverse in part.

### I.

Brenda and Tony Park were canning food in their home in Mineral,
Virginia, on November 22, 1998. They left their home between 10:30
p.m. and 11:00 p.m. to walk to the Mobil Mart to purchase canning
lids.

When the Parks arrived at the Mobil Mart, the store was suffi-
ciently lit to give the impression that someone was still working
inside. Mrs. Park pulled on the door which opened without the use of
excessive force. Mrs. Park proceeded to enter the store and, in doing
so, triggered the alarm. Mr. Park remained outside.

The 911 operator at the Louisa County Sheriff's Department
received a call from ADT alerting her to the alarm activation at the
Mobil Mart. Shortly thereafter, Mrs. Park placed a 911 call to the
Louisa County Sheriff's Department and informed the operator she
had opened the door and found no one inside and that an alarm had
been triggered. The Parks agreed to wait at the scene until law
enforcement officers arrived.

Louisa County Sheriff's Deputies Stephen Shiflett and Jeff Simms
responded to the dispatcher's call regarding the alarm activation.
They were aware that a woman had entered the store, triggered the
alarm, called 911, and was waiting at the scene. The deputies were

never informed that the call was for any potential criminal offense, i.e. breaking and entering.

The deputies asked the Parks a few questions, and the Parks provided the deputies with their names and address and related the events that led to the 911 call. Deputy Shiflett inspected the store and found nothing to indicate a forced entry. No merchandise appeared out of place and nothing appeared to be missing. The only thing suspicious was that a cash drawer, containing only loose change, was lying on the floor in the office.

Because the Parks planned on only a brief trip to the store, they mistakenly left the stove burner on under the canner. The Parks became concerned about the potential fire hazard at their home, and Mrs. Park entered the store to inquire as to why the deputies were taking so long. Mrs. Park was ordered to wait outside by Deputy Shiflett.

When the deputies emerged from the store, the Parks informed them of their concern about the fire hazard at their home and asked that at least one of them be allowed to go home and turn off the stove; the deputies refused to let them leave. Mrs. Park decided to make another 911 call to request that the fire department be sent to her home to turn off the pressure cooker. During the call, Mr. Park, against the orders of the officers, began to walk away to return home. Deputy Simms grabbed Mr. Park and told him that he was being detained until the owner of the store arrived, but that he was not under arrest. He placed Mr. Park in handcuffs and directed him toward the building. Deputy Shiflett then kicked Mr. Park's legs apart and threw him up against the building. At no time did Mr. Park physically resist arrest, nor did he ever verbally or physically threaten the officers. However, officer Simms testified that Mr. Park was not cooperative.

In the midst of her second 911 call, Mrs. Park turned around and saw her husband pressed up against the front of the store and being handcuffed. Mrs. Park claims that she ran toward her husband and was grabbed by Deputy Shiflett. The officers claim that Mrs. Park initiated the contact by grabbing Deputy Shiftlett. It is undisputed, however, that Deputy Shiflett twisted Mrs. Park's arm behind her back, threw her up against the building, and handcuffed her. He sprayed her

twice in the eyes with Oleoresin Capsicum ("OC") spray from close range.[1]

The effects of OC spray include (1) dilation of the capillaries and instant closing of the eyes through swelling of the eyelids, (2) immediate respiratory inflammation, including uncontrollable coughing, retching, shortness of breath and gasping for air with a gagging sensation in the throat, and (3) immediate burning sensations to the mucous membranes, skin and inside the nose and mouth. Mrs. Park suffered each of these effects.

Deputy Shiflett then transported Mrs. Park to the Louisa County Sheriff's Department. Upon arriving, Deputy Shifflet took Mrs. Park inside, tripping and pushing her as she entered. He then threw Mrs. Park into a cell. Later that evening Deputy Shiflett transported Mrs. Park to the regional jail in Orange, Virginia. During this drive, Deputy Shiflett manipulated the volume of the car radio "in a menacing and harassing fashion."

It is not disputed that following the owner's examination of the store, nothing appeared amiss and no crime was committed. The Parks were not charged with any crime and were released.

As a result of the incident, Mrs. Park claims that she suffers from severe Post Traumatic Stress Disorder and will continue to do so in the future. Mr. Park claims damages as a result of unlawful arrest, including battery, humiliation and harassment.

---

[1]The Louisa County Sheriff's Department ("LSCD") Rules and Regulations Manuel directs officers not to use OC spray at distances less than three feet. In addition, after one application of spray, the deputy is directed to wait and observe the effects of the spray to determine whether another application is necessary. Mrs. Park was sprayed twice at a range of approximately 18 inches, without the requisite delay between sprays.

The LCSD manual also provides guidelines to be followed after application of OC spray. "Subjects who are sprayed with OC should be monitored and verbally reassured that they are safe . . . . The subject(s), if wet with OC should dry before transporting." The deputies in this matter failed to reassure Mrs. Park, and poured water over Mrs. Park such that the residue from the spray washed directly into her eyes.

The district court, based on a long bench trial in front of a Magistrate Judge B. Waugh Crigler of the United States District Court for the Western District of Virginia, at Charlottesville, in which the parties testified to the events as they claim they occurred, awarded damages of $450,000 to Mrs. Park and $50,000 to Mr. Park respectively.

## II.

The standard of review at issue here is primarily that as pertains to the detention of the Parks by the deputies. Ultimate questions of reasonable suspicion to make a warrantless seizure of a person involve both questions of fact and law and are reviewed *de novo* on appeal, though the appellate court is bound by the trial court's findings of historical facts leading up to the stop or search unless clearly erroneous based on the evidence. *See Ornelas v. United States*, 517 U.S. 690-91, 699 (1996) (holding when mixed question of law and fact issue of whether the historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause is to be reviewed *de novo* to avoid unacceptably varied results based on the interpretation of similar facts by different trial judges). However, a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn therefrom by resident judges. *Id*. Therefore, it is appropriate for this court to review the probable cause determinations *de novo*, but should review the findings of fact and the credibility determinations under a clearly erroneous standard. *See United States v. Gray*, 137 F. 3d 765, 770 (4th Cir. 1998) (holding district court's factual findings in search and seizure context are reviewed on appeal for clear error, however, whether given facts constitute probable cause is a legal determination which is reviewed *de novo*).

## III.

### A.

"No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Terry v. Ohio*, 392 U.S. 1 (1968) (quoting *Union Pac. R. Co. v. Botsford*, 141

U.S. 250, 251 (1891)). It is from this sacred right that this case finds its genesis.

Through the years of Fourth Amendment jurisprudence, courts have attempted to strike a delicate balance between the needs of law enforcement officers who constantly place themselves in harm's way, and the sacred rights described above.

The police can stop and detain a person for investigative purposes "if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. at 20). In order to justify a *Terry* seizure, "the police officer must be able to point to specific and articulable facts which, taken together, with rational inferences from those facts, reasonably warrant that intrusion." 392 U.S. at 21. Thus, the legitimacy of an investigative stop turns on what constitutes "reasonable suspicion," which this court has called "a common-sensical proposition . . . properly crediting the officers who observe on a daily basis what transpires on the street." *United States v. Lender*, 985 F. 2d 151, 154 (4th Cir. 1993). Because the intrusion created by an investigative stop is minimal, the reasonable suspicion standard is not onerous. *See United States v. Harris*, 29 F. 3d 1262, 1268-69 (4th Cir. 1994) (holding officer's observation of man leaving apartment in a vehicle after confidential informant advised drug delivery was imminent constitutes reasonable suspicion to stop); *United States v. Moore*, 817 F. 2d 1105, 1007 (4th Cir.) (holding officer's nighttime observation of a man walking away from a deserted area where burglar alarm had just gone off, constitutes reasonable suspicion to stop man).

A *Terry* or investigative stop can cross the line and turn into an arrest under certain circumstances. The test for determining whether an individual is in custody or under arrest is whether, under the totality of the circumstances, the "suspect's freedom of action is curtailed to a degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (holding in context of when suspect is under arrest or in custody for purpose of *Miranda* warning).

A warrantless arrest is, however, permitted where there is probable cause based on a subjective standard to believe a felony is being or

has been committed by the arrested individual, based upon the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983). As the Supreme Court explained in *Gates*, "probable cause is a fluid concept — turning on the probabilities in particular factual contexts — not readily or even usefully, reduced to a neat set of legal rules." *Id.* at 232. This court has articulated the probable cause standard as "facts and circumstances within the officer's knowledge [which] would warrant the belief of a prudent person that the arrestee had committed or was committing an offense." *United States v. Manbeck*, 744 F. 2d 360, 376 (4th Cir. 1984).

## B. *Tony D. Park*

Thus, based on the claims of Mr. Park the court first must determine whether he was in fact arrested or just simply detained under the law. Second, the court must determine whether the arrest was lawful. Third, it must be determined whether Tony Park was the victim of assault, battery and false imprisonment.

## 1. Detention v. Arrest

The deputies list the following factors as giving rise to reasonable suspicion in this case: (1) the report of an alarm from the dispatcher, (2) the lack of lighting in the store, (3) Mrs. Park being intoxicated and, (4) the cash drawer being on the floor. The court must evaluate the combined strength of these factors in determining whether or not there was reasonable suspicion to detain Mr. Park. *See United States v. Sokolow*, 490 U.S. 1, 8-10 (1989).

The trial judge determined that the store was well lit and that Mrs. Park was not intoxicated. These are historical facts and therefore should be reviewed for clear error. *See Ornelas v. United States*, 517 U.S. 690-91, 699 (1996). Furthermore, based on findings of the trial court, the officers were aware that a woman had entered the store, triggered the alarm, called 911, and was waiting at the scene. The deputies were never informed that the call was for any potential criminal offense, i.e. breaking and entering. The trial judge also determined that the officers were familiar with the Parks and knew that they lived within walking distance of the scene of the incident.

However, even based on the findings of the trial court, regardless of what the officers knew when they arrived on the scene, they arrived to find the Parks, who had triggered the alarm, waiting for them in front of a deserted convenience store in which the tray to the cash register was misplaced.

It is true that the intrusion created by an investigative stop is minimal, and that therefore the reasonable suspicion standard is not onerous. *See United States v. Moore*, 817 F. 2d 1105, 1107 (4th Cir.) (holding officer's nighttime observation of man walking away from otherwise deserted area where burglar alarm had just gone off constitutes reasonable suspicion to stop man). However, this court has held that "reasonable suspicion" must include "particularized evidence that . . . criminal activity is afoot." *United States v. Sprinkle*, 106 F. 3d. 613, 618-19 (4th Cir. 1997). The bottom line under a reasonable suspicion analysis is that the court must consider the totality of the circumstances — the whole picture — in deciding whether officers had reasonable suspicion of criminal activity so as to justify an investigative stop.

It is a close call as to whether or not the officers had reasonable suspicion to stop and detain Mr. Park. However, the court need not decide this issue as the court concludes that Mr. Parks was not simply detained but was arrested.

It is the finding of this court that Mr. Park's freedom was curtailed to a degree associated with formal arrest. *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984).[2] Even notwithstanding the fact that the deputies specifically told Mr. Park that he could not leave, it is inconceivable, based on the facts as determined by the trial court, that Mr. Park would have felt free to leave after being thrown against the wall, kicked, handcuffed and locked in the patrol car.

---

[2]The Lousia County Sheriff's Department Rules and Regulations Manual states, "The test, in interviews or stops of persons, for whether an arrest has occurred . . . is whether a reasonable person under the circumstances would have felt free to leave."

## 2. Wrongful Arrest

As discussed above, this court has articulated the probable cause standard as "facts and circumstances within the officer's knowledge [which] would warrant the belief of a prudent person that the arrestee had committed or was committing an offense." *United States v. Manbeck*, 744 F.2d 360, 376 (4th Cir. 1984).

The officers assert that they had probable cause to arrest. However, this assertion flies in the face of the factual findings of the trial court which are to be reviewed for clear error in this matter. *See United States v. Gray*, 137 F.3d 765, 770 (4th Cir. 1998). The trial judge found that while Mr. Park did indeed begin to walk toward his home once he realized the potential for a fire, the brute force that the officers used to detain Mr. Parks combined with the fact that he was handcuffed and locked in the patrol car gives this court reason to doubt the officers' assertion that Mr. Park was free to leave despite the fact that Mr. Park was told that he was not under arrest. Therefore, based on the totality of the circumstances — the historical findings of fact of the trial court — the evidence reveals that Mr. Park was arrested without probable cause, and therefore, the trial court was correct in determining that Mr. Park was wrongfully arrested.

## 3. Battery, Assault and False Imprisonment

Under Virginia law, the slightest touching of another, or of his clothes, or cane, or anything else attached to his person, if done in a rude, insolent or angry manner constitutes a battery. *Crosswhite v. Barnes*, 139 Va. 471, 124 S.E. 242, 243 (Va.App. 1924). Based on the findings of fact by the trial court, Mr. Park was wrongfully arrested, and in the course of this illegal arrest, he was thrown up against a wall, his legs were kicked apart, and he was handcuffed. This constitutes the unlawful touching associated with a battery.

The common law tort definition of "assault" is an intentional offer to touch the person of another that created in the mind of the victim a reasonable apprehension of an immediate battery. *See e.g. Epps v. Commonwealth of Virginia*, 28 Va.App. 58, 502 S.E.2d 140 (Va.App. 1998). Based on the extensive findings of the trial court, it is appro-

priate to conclude that Mr. Park suffered an assault at the hands of the officers.

Under Virginia law, "false imprisonment" is restraint of one's liberty without sufficient legal excuse. *Montogomery Ward & Company v. Wickline*, 188 Va. 485, 50 S.E. 2d 387 (Va.App. 1948). It is clear from the record that Mr. Park's liberty was so restrained.

## C. *Brenda S. Park*

Brenda Park contends that the use of force by the officers in restraining her was excessive. Based on the findings of the trial court contained in the facts set forth above, the irresponsible use of pepper spray twice from close range on the unarmed Mrs. Park was indeed excessive. An analysis of excessive force, "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 398 (1989). It is difficult to imagine the unarmed Mrs. Park as a threat to the officers or the public.

## D. *Qualified Immunity*

"A police officer should prevail on an assertion of qualified immunity if a reasonable officer possessing the same information could have believed that his conduct was lawful." *Slattery v. Rizzo*, 939 F.2d 213, 216 (4th Cir. 1991) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)); *see also McLenagan v. Karnes*, 27 F.3d 1002, 1007 (4th Cir. 1994) (stating that regardless of whether probable cause actually exited, officer is entitled to qualified immunity if the officer "*could have . . .* believed that his conduct was lawful"). The determination of whether qualified immunity exists is ultimately a question for the court. The standard used for determining qualified immunity is an "objectively reasonable" standard. The court does not look to the subjective intent of the officer in granting qualified immunity.

The calculus of reasonableness must embody allowances for the fact that police officers are often forced to make split-second judge-

ments — in circumstances that are tense, uncertain and rapidly evolving — about the amount of force that is necessary in a particular situation. *Sigman v. Chapel Hill*, 161 F. 3d 782 (4th Cir. 1998). As the trial court judge explained in his opinion, "Such a determination requires me to balance the nature and the quality of the intrusion on the plaintiffs' Fourth Amendment interests against the importance of the governmental interests alleged by the instant intrusion. The outcome of that test depends on all of the circumstances of the case as they existed at the time of the incident from the perspective of a reasonable police officer, not with 20/20 hindsight at the time of this trial."

When the trial judge did this balancing, after listening to extensive testimony from all the parties, he determined that the force used by the officers was unreasonable and excessive. The questions that should be asked are whether or not reasonable police officers, acting under the same or similar circumstances, would have twice, from close range, sprayed Mrs. Park with OC, and would they have handcuffed and arrested the Parks after throwing them against the wall and on the ground? This court does not think so.

## E. *Damages*

The magistrate judge awarded damages of $50,000 to Mr. Park and $450,000 to Mrs. Park. The defendants-appellants contend that the judge erred in awarding such damages. Only compensatory damages are appropriate in this matter, as the plaintiffs did not ask the court to assess any punitive damages. Therefore, the question is whether or not the damages awarded were excessive compensation for the Parks' damages.

As defendants-appellants contend, there is no evidence in the record to sustain a damage award for Mr. Park. There was no evidence of physical injury suffered by Mr. Park and the general rule is that the plaintiff must not only show legal injury, but also a perceptible resultant damage with reasonable certainty. *See generally Burns v. Hines*, 94 Va. 413, 28 S.E. 875 (1897); *Diggs v. Lail*, 201 Va. 871, 114 S.E. 2d 743 (1960). The $50,000 awarded looks like an award of punitive damages, and it is clear from the law and the record that such an award is inappropriate in this case. However, in a case in which

a plaintiff's civil rights are found to have been violated, it is appropriate to award nominal damages. *Carey v. Piphus*, 435 U.S. 247, 265 (1978); *Norwood v. Bain*, 166 F.3d 243, 254 (4th Cir. 1999). A plaintiff's failure to prove compensatory damages results in nominal damages, typically one dollar. *Price v. City of Charlotte N.C.*, 93 F.3d 1241, 1246 (4th Cir. 1996). The rationale for the award of nominal damages being that federal courts should provide some marginal vindication for a constitutional violation. *Id.* at 1246. Therefore, it is the finding of this court that nominal damages of one dollar are appropriate for Mr. Park.

Based on the record, however, Mrs. Park suffered severe and costly injuries. On review of the record, it is clear that Mrs. Park suffered out-of-pocket expenses of approximately $7,500. As the trial judge held, there is no question that for some period of time she is going to incur medical expenses. The trial judge found that Mrs. Parks' medication currently costs $427 per month alone, not counting treatment. This finding is based on what the judge considered to be the credible determinations of reliable medical personnel and other healthcare experts. According to this finding, Mrs. Park will incur medical costs of up to approximately $300,000 in the future based on past and present calculations. Therefore, Mrs. Park should be entitled to compensatory damages of $300,000 to compensate her for the expenses incurred.

### F. *Attorney's Fees Appropriate*

Based on the trial judge's thorough review of this matter, the costs and fees should be upheld.

### IV.

"[N]othing can so militate against the effective administration of justice and the proper regard for the law of the land as unlawful and reckless conduct on the part of officers who are charged with its enforcement." *Crosswhite v. Barnes*, 139 Va. 471, 124 S.E. 242 (Va.App. 1924) (quoting *Bourne v. Richardson*, 133 Va. 441, 113 S.E. 893 (Va.App. 1922)). Therefore, it is the finding of this court that Mrs. Park is entitled to $300,000 and Mr. Park is entitled to nominal

damages of one dollar. The trial court is affirmed as to liability and reversed as to damages.

*AFFIRMED IN PART AND REVERSED IN PART*

TRAXLER, Circuit Judge, concurring in part and dissenting in part:

I agree that Officers Shiflett and Simms violated Mr. Park's Fourth Amendment right to be free from an unreasonable seizure, and that Officer Shiflett used excessive force in effectuating his arrest of Mrs. Park.* I also agree that the officers are not entitled to qualified immunity. Consequently, I concur in the majority's decision to affirm the judgment of liability on the Parks' claims, as well as the award of attorneys' fees and costs.

I respectfully dissent, however, from the conclusion that the damages awarded to Mr. and Mrs. Park were excessive as a matter of law. In my view, the majority has, in contravention of the proper standard of review, substituted its judgment for that of the trial judge as to what is a fair verdict in this case.

I.

I begin with the standard of review applicable to the magistrate judge's assessment of damages. Historically, we have reviewed an award of compensatory damages imposed by a jury to redress a violation of a federal right only to determine whether the award "is so untoward, inordinate, unreasonable or outrageous as to be a denial of justice to allow it to stand." *Sevigny v. Dicksey*, 846 F.2d 953, 959 (4th Cir. 1988) (internal quotation marks omitted). The Eighth Circuit, at least, would apply the same standard where a judge assesses damages for such a claim in the course of a bench trial:

---

*I note, however, that the record reveals that Mrs. Park was indeed charged by Deputy Shifflett with disorderly conduct, obstruction of a law enforcement officer in the performance of his duties, and public drunkenness. And, she was held overnight in jail. The charges were eventually *nolle prossed* by the Commonwealth's attorney and dismissed.

> Because "inadequacy . . . of the verdict is basically, and should be, a matter for the trial court which has had the benefit of hearing the testimony and of observing the demeanor of the witnesses and which knows the community and its standards," *Solomon Dehydrating Co. v. Guyton*, 294 F.2d 439, 447 (8th Cir. 1961), we must defer to the district court's assessment of damages unless there is "'plain injustice' or a 'monstrous' or 'shocking' result." *Id.* at 448. As a result, we review the district court's determination of the damage award for abuse of discretion.

*St. John v. United States*, 240 F.3d 671, 678 (8th Cir. 2001).

I too believe that our review for excessiveness should be the same whether damages are assessed by a jury or a judge, and that our *Sevigny* standard would be an appropriate one to apply. At a minimum, however, we have recognized that "[t]he trial court, as a factfinder, possesses considerable discretion in fixing damages, and its decision will be upheld absent clear error." *Little Beaver Enters. v. Humphreys Rys.*, 719 F.2d 75, 79 (4th Cir. 1983); *see also United States ex rel. Maddux Supply Co. v. St. Paul Fire & Marine Ins. Co.*, 86 F.3d 332 (4th Cir. 1996) ("The calculation of damages is a finding of fact and therefore is reviewable only for clear error, but to the extent those calculations were influenced by legal error, review is *de novo*."); *Scott v. Vandiver*, 476 F.2d 238, 243 (4th Cir. 1973) ("Ascertainment of damages arising from personal injuries involves questions that are essentially factual, and an award by a district judge will not be upset unless it is clearly erroneous."). "A finding is clearly erroneous when, although there is evidence to support it, on the entire evidence the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Front Royal v. Town of Front Royal*, 135 F.3d 275, 284 (4th Cir. 1998) (quoting *Faulconer v. Commissioner*, 748 F.2d 890, 895 (4th Cir. 1984)); *see* Fed. R. Civ. P. 52(a) ("Findings of fact . . . shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses").

Having reviewed the magistrate judge's findings underlying the damages award to Mr. and Mrs. Park and the evidence supporting those findings, I am satisfied that the magistrate judge's findings are

not clearly erroneous and that, given the egregious nature of the violations and the physical and mental injuries inflicted, the damages awarded are not excessive as a matter of law.

II.

A.

I begin with the award of compensatory damages to Mrs. Park in the amount of $450,000. To be sure, this award is not insubstantial, but neither was the egregious treatment she received nor the injuries she sustained at the hands of Officer Shiflett.

According to the evidence found credible by the magistrate judge, Officer Shiflett grabbed Mrs. Park that evening by the arm, twisted her arm behind her back, threw her against the building, sprayed her twice in the eyes with pepper spray at close range (in contravention of the department rules and regulations governing the use of pepper spray and once after pulling away her glasses), haphazardly dumped water over her head in a futile effort to wash away the effects, and then placed her in the confined space of the patrol car in handcuffs where she suffered from additional pain and shortness of breath caused by the spray. During the struggle, she was also pushed to the ground hard enough to "knock her silly."

After she was released from jail, Mrs. Park was examined by her family physician. In addition to finding Mrs. Park to be upset and withdrawn, the physician noted that Mrs. Park had sustained numerous physical injuries (many confirmed by photographs), including a contusion to her head, swelling over the left eye and cheek, large bruises on her hands, swelling at the base of her fingers on her right hand, incipient bruises on the back and side of her forearm, a "grab injury" on the right upper arm, and abrasions to both knees. Her eyes were blood-shot, with a yellowish tinge. Her right hand was splinted and she was referred to orthopedics. The following day, Mrs. Park called her physician, still very upset and agitated, and was prescribed Valium.

A week later, Mrs. Park was reevaluated by her family physician. At that time, she was found to be suffering from headaches and con-

tinued irritation of the lateral side of the left eye. Both hands were sore and she was having pain in the lower back and hip. In addition, she continued to have psychological effects from the incident, including difficulty sleeping, nightmares, and severe panic attacks. She was eventually diagnosed with moderate to severe Post Traumatic Stress Disorder (PTSD) and referred to a psychiatrist and psychologist for further treatment, which was continuing at the time of trial.

Based upon this and other unrefuted evidence, the magistrate judge found that Mrs. Park suffers from PTSD as a result of Officer Shiflett's actions. At the time of trial, Mrs. Park had sustained approximately $7,800 in out-of-pocket expenses and was expected to incur between $200,000 and $300,000 in future medical expenses — thus establishing virtually uncontested compensatory damages of over $250,000 solely for past and future medical expenses associated with her physical and mental injuries.

I am unprepared to conclude, as a matter of law, that the additional $200,000 in compensatory damages which the magistrate judge awarded was excessive, or that the findings supporting the award were clearly erroneous. *Cf. Goodwin v. Metts*, 885 F.2d 157, 164-65 (4th Cir. 1989) (holding that compensatory damage awards of $65,000 and $90,000 were not excessive despite the fact that plaintiffs only proved $3,500 in out-of-pocket expenses: "We will not disturb the district court's discretionary ruling merely because the compensatory award considerably exceeded [plaintiffs'] out-of-pocket losses"), *overruled in part by Albright v. Oliver*, 510 U.S. 266 (1994); *Sevigny*, 846 F.2d at 959 (holding that an award of $112,000 in compensatory damages for violation of plaintiff's Fourth Amendment rights was not excessive even though plaintiff only proved $3,680 in special damages because "[t]here was also substantial evidence . . . from which the jury could, and presumably did, find that [she] suffered extreme emotional distress"); *Spell v. McDaniel*, 824 F.2d 1380, 1400 (4th Cir. 1987) (holding that a compensatory damage award of $900,000 was not excessive, even though the medical expenses for physical injuries were only $2,041).

Mrs. Park's damages are clearly not limited to her out-of-pocket expenses, nor to the medical costs that she is projected to incur in the future. Rather, Mrs. Park sustained significant, visible inju-

ries as a direct result of the excessive force brought to bear upon her that night, considerable pain and suffering during her physical recuperation, and severe emotional injuries, including humiliation, mental anguish, emotional trauma, and nightmares. These injuries were documented by her treating physicians and therapists, and the magistrate judge personally questioned the witnesses regarding them to ensure their validity. Defendants have pointed to no authority which would limit Mrs. Park's recovery of compensatory damages to her out-of-pocket and expected future medical costs, and I am aware of none. *Cf. Jenkins v. Averett*, 424 F.2d 1228, 1233 (4th Cir. 1970) (reversing and remanding district court's award of compensatory damages for violation of plaintiff's civil rights as inadequate because the court limited plaintiff's recovery to his out-of-pocket expenses and took no account of, among other things, the plaintiff's pain and suffering).

B.

I likewise believe that the magistrate judge's compensatory award of $50,000 to Mr. Park is supported by findings which are not clearly erroneous.

Unlike Mrs. Park, Mr. Park sustained only minor physical injuries associated with his detention and unlawful arrest when Officer Shiflett pressed his face against the wall and kicked his feet out. However, the magistrate judge reasonably found that Mr. Park had also suffered considerable indignity, embarrassment, and humiliation associated with the treatment he received, all while he was forced to witness helplessly the physical assault inflicted upon his wife by an out-of-control police officer.

Because the majority believes there was no such evidence of damages, it surmises that the magistrate judge's award was really punitive in nature and eliminates Mr. Park's compensatory award in its entirety. While I agree that an award of punitive damages would have been inappropriate because they were not pursued by the plaintiffs (indeed, the magistrate judge noted as much), I find no basis in the record to support a conclusion that the magistrate judge abandoned his duty and awarded punitive damages under the guise of "compensatory damages." In my view, the magistrate judge's findings regarding the damages sustained by Mr. Park are not clearly erroneous and

his assessment of damages not excessive for the physical and emotional injuries he sustained.

### III.

To summarize, I believe it is error for this court to arbitrarily substitute its view of an appropriate amount of damages for that ascertained and awarded by a magistrate judge in a nonjury trial who, unlike us, has had the benefit of hearing the testimony and observing the demeanor of the witnesses. Because the findings supporting the award of compensatory damages to Mr. and Mrs. Park are not clearly erroneous and the amounts not excessive as a matter of law, I would affirm all aspects of the magistrate judge's decision.