**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 24-6398**

---

KEVIN SNODGRASS, JR.,

Plaintiff - Appellant,

v.

CHRISTOPHER GILBERT; REANNE KEGLEY, Counselor at ROSP; AMEE DUNCAN, Counselor at ROSP; TORI RAIFORD, Unit Manager at ROSP; WALTER SWINEY, Unit Manager at ROSP; GARRY ADAMS, Lieutenant at ROSP; E. R. BARKSDALE, Head Warden at ROSP; JOHN HAMILTON, Asst. Warden at ROSP; GERALD WASHINGTON, Central Classification Services VADOC; DAVID A. STILL, Captain/Unit Manager at ROSP; A. GALLIHAR, Major/Chief of Housing and Program at ROSP; HENRY PONTON, Region Director-Western VADOC; KELLY STEWART, Counselor at ROSP,

Defendants - Appellees.

---

Appeal from the United States District Court for the Western District of Virginia, at Roanoke. Pamela Meade Sargent, Magistrate Judge. (7:16-cv-00091-PMS)

---

Argued: January 30, 2025                    Decided: March 25, 2025

---

Before THACKER, RICHARDSON, and BENJAMIN, Circuit Judges.

---

Affirmed by unpublished per curiam opinion.

---

**ARGUED:** Virginia N. Oat, O'MELVENY & MYERS LLP, Washington, D.C., for Appellant. Brendan Chestnut, OFFICE OF THE ATTORNEY GENERAL OF

VIRGINIA, Richmond, Virginia, for Appellees.  **ON BRIEF:**  Benjamin D. Singer, Meredith N. Garagiola, Brian P. Quinn, O'MELVENY & MYERS LLP, Washington, D.C., for Appellant.  Jason S. Miyares, Attorney General, Laura H. Cahill, Assistant Attorney General, Erika L. Maley, Solicitor General, Kevin M. Gallagher, Principal Deputy Solicitor General, Michael Dingman, Assistant Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellees.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Kevin Snodgrass Jr. ("Appellant") filed this civil rights action pursuant to 42 U.S.C. § 1983 against Christopher Gilbert, Reanne Kegley, Amee Duncan, Tori Raiford, E.R. Barksdale, John Hamilton, Gerald Washington, David A. Still, A. Gallihar, Henry Ponton, Kelly M. Stewart, Walter Swiney, and Gary Adams (collectively "Appellees"), all of whom were employed by the Virginia Department of Corrections ("VDOC"). Appellant alleges that Officer Gilbert, excessively deployed oleoresin capsaicin ("OC") spray in his face, in violation of the Eighth Amendment.[1] Appellant also alleges that Appellees conspired to retaliate against Appellant's exercise of his First Amendment rights.

Because there is no genuine dispute of material fact as to whether the officers deployed force wantonly or maliciously, we affirm the district court's grant of qualified immunity on Appellant's Eighth Amendment claim. As to Appellant's First Amendment retaliation claim, he presents no meaningful challenge to the lower court's determination, made after two bench trials, that he failed to make a prima facie showing on causation.

Therefore, we affirm judgment for Appellees.

---

[1] OC spray is a chemical agent similar to pepper spray or mace. *See Park v. Shiflett*, 250 F.3d 843, 849 (4th Cir. 2001).

3

I.

At all times relevant to this appeal, Appellant was serving a sentence for first degree murder at Red Onion State Prison ("ROSP"), a supermax state prison located in Pound, Virginia, which is part of the VDOC.[2]

A.

VDOC Inmate Housing Procedure

VDOC assigns inmate housing by designating each offender a security level ("SL"). An SL is "a measure of the degree of physical restraint and supervision that is required to maintain adequate control over an offender to prevent escapes, minimize risk of staff and offender injury, and maintain orderly facility operations while providing for the safety of the general public." J.A. 426.[3] VDOC uses six SLs, with SL1 allowing the most freedom for an inmate and SL6 requiring segregation, i.e., solitary confinement. In addition to the SLs, there are also "specialty designations." *Id.* at 427. The specialty designation "S" which stands for segregation is relevant here. *Id.* If an inmate is given the specialty designation S, he is referred to as an "SLS inmate." *Id.* at 436. SLS is a "non-scored security level reserved for offenders who must be managed in a segregated setting." J.A. 436. SLS inmates can be assigned to different levels of management decreasing in severity

---

[2] "Supermax facilities are maximum-security prisons with highly restrictive conditions, designed to segregate the most dangerous prisoners from the general prison population." *Wilkinson v. Austin*, 545 U.S. 209, 213 (2005).

[3] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

4

from "intensive" to "re-entry unit." J.A. 436–37. Relevant here is the special management ("SM") designation. J.A. 436. This designation applies to:

> Offenders who may display an institutional adjustment history indicating repeated disruptive behavior at lower level facilities, a history of fighting with staff or offenders, and/or violent resistance towards a staff intervention resulting in harm to staff, other offenders without the intent to invoke serious harm or the intent to kill, or serious damage to the facility, and where reasonable interventions at the lower security level have not been successful in eliminating disruptive behaviors.

J.A. 436–37.

VDOC's step-down program is a set of "procedures for incentive-based offender management which will create a pathway for offenders to step down from SLS to lower security levels." J.A. 436. Inmates in the step-down program are assigned a privilege status. As they move successfully through the program, they are granted more privileges. There are three privilege levels in the special management classification of the step-down program: SM0 (fewest privileges), SM1, and SM2 (most privileges). Then, "following a successful period in . . . SM, offenders will be eligible for advancement to step down from [SLS] to their first introduction into general population at [SL6]." *Id.* at 440. The process for moving through the security levels is extensive: an inmate must spend at least three months at each stage, meet goals for responsible behavior, and participate in self-improvement and education programs. J.A. 459 ("Each SM offender will have their case reviewed every 90 days. . . . The [] Committee will review the ratings on each SM offender to determine when they have met the goals to be eligible for advancement to the next status level."). One of the required curriculums in order for an inmate to move through the

5

security levels is "Challenge Series programming." *Id.* at 443. This program has seven workbooks, each corresponding to an SL. An inmate must complete the workbook corresponding to his SL before moving to the next level.

Upon completing SM2, an inmate may enter SL6, the first step back into the general population. SL6 gradually introduces, or reintroduces, inmates into the general population through two phases. Inmates in SM-SL6 Phase 1 are still segregated in single cells, but they are permitted to leave their cells unrestrained for movement to the shower and recreation and, gradually, to participate in educational programming with small groups of other inmates. Inmates in SM-SL6 Phase 2 have cell mates, are unrestrained for showers and recreation; have outside recreation with other inmates for an hour, twice a week, and can walk to meals with other inmates to eat their meals together in the dining hall. If an inmate completes the goals in SL6, he may then be reduced to SL5 and be placed in a general population setting.

## B.

## Use of Force

At noted, at all times relevant to this appeal, Appellant was an inmate at ROSP. On September 21, 2015, while Appellant was classified as an SL6 inmate, two unnamed ROSP officers searched Appellant's cell. During the search, the officers discovered Appellant had "the contents of MASH" in his cell.[4] J.A. 379. Because of this infraction, an unnamed

---

[4] Mash refers to "crushed malt or gain meal steeped and stirred in hot water to produce wort." *Mash*, *Mirriam-Webster Dictionary* (https://perma.cc/BCW2-R7JQ). (Continued)

6

officer ordered Appellant to "cuff up" so that he could be escorted to pre-hearing detention by Officer Gilbert. Appellant denied possessing the contraband and refused to be handcuffed. Specifically, Appellant protested that he did not need to be handcuffed to be moved to pre-hearing detention because of his current SL status.

In addition to the unnamed officer, Officer Gilbert also ordered Appellant to submit to restraints so Appellant could be transported to pre-hearing detention. Appellant asked to see a supervisor and continued to argue that he did not need to be handcuffed to be transported. Appellant volunteered to come out of his cell without restraints but steadfastly refused to be restrained. Officer Gilbert attempted to negotiate with Appellant for thirty minutes, continually informing Appellant that he must submit to the order to be cuffed. After Appellant still refused to leave his cell with handcuffs, Officer Gilbert sprayed Appellant with three blasts of OC spray. Appellant, "blinded and choking from the OC spray," then complied with the order to be cuffed. J.A. 27. Once cuffed, Appellant was taken to a shower to decontaminate and then checked out by a nurse because he complained of burning eyes. The nurse told Appellant that he could wash his eyes out further in his cell. But Appellant was not returned to his normal cell. Instead, he was placed in a strip cell where he was forced to sit in only boxer shorts for the night and was not given anything to use to wash his eyes.

---

Wort refers to "a sweet liquid drained from mash and fermented to make beer and whiskey. *Wort*, *Mirriam-Webster Dictionary* (https://perma.cc/BKP5-GF6E).

C.

Progression through the Step-Down Program

Following the OC spray incident, Appellant was moved into segregated housing and designated as an SLS inmate. On October 26, 2015, Appellant was classified as SM0 and began working to move through the step-down program. While in SM0, Appellant testified in another inmate's lawsuit against ROSP officers on November 19, 2015. He also filed a grievance on December 27, 2015, alleging that Officers Swiney and Raiford had previously conspired to keep him at SL6 status by failing to provide him with the workbooks necessary to progress through the step-down program. In his grievance, Appellant requested a transfer back to the general population.

On March 2, 2016, Appellant filed the instant lawsuit. On that same day, Appellant progressed from SM0 to SM1. While in SM1, Appellant filed a second grievance on April 5, 2016, alleging improper calculations as to his SL status. On June 22, 2016, Appellant filed another grievance alleging the same.

In September 2016, Appellant progressed to SM2 status, but he received an infraction and was moved back to SM1 status in December 2016. In April 2017, Appellant again progressed to SM2 and was moved back into the general population roughly two months later.

D.

Procedural History

On March 2, 2016, Appellant, proceeding pro se, filed this civil rights action in the United States District Court for the Western District of Virginia alleging that Appellees

8

Gilbert and Lewis used excessive force in violation of the Eighth Amendment when they deployed OC spray after Appellant refused to be restrained to leave his cell. Appellant also alleged that Appellees Gilbert, Lewis, Kegley, Duncan, Stewart, Raiford, Swiney, Day, Adams, Barksdale, Washington, Hamilton, Still, Gallihar, Clarke, and unnamed ROSP mailroom staff retaliated against him by conspiring to delay his progression through the step-down program.[5] He alleged the retaliation was because he had exercised his rights to access the courts and the prison grievance system.

On July 18, 2016, Appellant filed a motion for leave to file a supplemental complaint, which the district court denied on October 27, 2016. On March 17, 2017, the district court granted Appellees' motion for summary judgment and dismissed Appellant's Eighth Amendment excessive force claim. The district court also dismissed one of Appellant's First Amendment retaliation claims, finding that Appellant's filing of grievances within ROSP did not constitute protected First Amendment activity. But the district court denied Appellees' motion for summary judgment as to Appellant's First Amendment claim that Appellees retaliated against him because he exercised his right to

---

[5] Appellant also claimed that ROSP officials conspired to violate his constitutional rights, violated the Prison Rape Elimination Act, subjected him to unconstitutional living conditions, and interfered with his right to access the courts. These claims were dismissed by the district court on summary judgment. Appellant has not appealed this portion of the district court's order.

9

access the courts. The district court then referred the remaining First Amendment retaliation claim to a magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(B).

After a two day bench trial in August 2017, the magistrate judge issued a report and recommendation recommending judgment be entered for Appellees because Appellant failed to establish, by a preponderance of the evidence, that Appellees conspired to delay his progression through the step-down program in retaliation for Appellant's use of the courts. The district court adopted the magistrate judge's report and recommendation over Appellant's objection.

However, the district court vacated part of its earlier summary judgment order in light of *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 541–43 (4th Cir. 2017). *Booker*, which was issued after the district court's March 2017 summary judgment order, held that an inmate engages in protected First Amendment activity by filing a grievance under his prison's grievance procedure. Consequently, the district court vacated its order with respect to Appellant's claim that his step-down progression was delayed in retaliation for his filing of complaints and grievances within ROSP. The district court then referred that retaliation claim to the magistrate judge for further proceedings. After conducting a second bench trial, the magistrate judge issued a report and recommendation finding that Appellant failed to establish by a preponderance of the evidence that Appellees retaliated against him for filing complaints and grievances. The district court adopted the report and recommendation over Appellant's objection, found that Appellant failed to prove his retaliation claim by a preponderance of the evidence, and entered judgment for Appellees.

10

On December 28, 2018, Appellant appealed from the district court's final judgment to this court. On October 23, 2020, we remanded the case for the district court to consider whether it had applied the correct legal standard in concluding that Appellees did not retaliate against Appellant's litigation or grievance activity by delaying his progression though the step-down program in light of *Martin v. Duffy*, 977 F.3d 294 (4th Cir. 2020). In *Martin*, we held, as a matter of first impression, that the burden shifting framework used to determine causation in employment retaliation cases -- known as the "same-decision test" -- also applies to prisoner retaliation claims. 977 F.3d at 299.

On remand, the case was transferred directly to the magistrate judge pursuant to 28 U.S.C. § 636(c)(1). Both parties briefed the issues, and Appellant was represented by counsel for the first time. On March 26, 2024, the magistrate judge held that Appellant failed to make the prima facie showing of causation necessary to succeed on his claim that Appellees delayed his progression through the step-down program in retaliation for either filing lawsuits or grievances.

Appellant timely appealed.

## II.

We review the district court's denial of a motion to amend a complaint, or file a supplemental complaint, for abuse of discretion. *United States ex rel. Carter v. Halliburton Co.*, 866 F.3d 199, 206 (4th Cir. 2017).

We review de novo a district court's grant of summary judgment based on qualified immunity. *Caraway v. City of Pineville*, 111 F.4th 369, 378 (4th Cir. 2024). In reviewing a summary judgment determination, we view the facts in the light most favorable to the

11

nonmovant. *Id.* A grant of summary judgment is appropriate only if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law on the qualified immunity claim. *Id.*

"We review judgments resulting from a bench trial under a mixed standard of review: factual findings may be reversed only if clearly erroneous and legal findings are reviewed de novo." *United States v. Kuehner*, 126 F.4th 319, 328 (4th Cir. 2025) (internal citations omitted). Lastly, we "read the pleadings of a pro se plaintiff liberally and interpret them to raise the strongest arguments that they suggest." *Martin v. Duffy*, 977 F.3d 294, 298 (4th Cir. 2020) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

### III.

### A.

### Denial of Leave to Supplement Complaint

We first consider Appellant's argument that the district court applied an incorrect legal standard when it denied his request to supplement his complaint. Appellees respond that the district court did not use an incorrect standard and did not abuse its discretion under any standard, because Appellees would have been prejudiced if the court had granted leave.

In his proposed supplemental complaint, Appellant sought to add factual allegations of alleged retaliation which occurred after he filed his initial complaint, and sought to assert new causes of action, with new defendants, based on those factual allegations.[6] The district

---

[6] A supplemental complaint is an additional pleading that adds allegations or factual matter, but it does not replace the originally filed complaint. Unlike an amended complaint, both complaints remain operative. *New Amsterdam Cas. Co. v. Waller*, 323 F.2d 20, 28 (Continued)

court denied Appellant's request to file the supplemental complaint because "the claims raised in the proposed complaint do not arise from the same sequence of events as those raised in the original complaint." J.A. 372. This was error. Without more, the addition of new causes of action, and new defendants, is not a permissible reason to deny leave to file a supplemental complaint. Fed R. Civ. P. 15(d) ("On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented."); *see also New Amsterdam Cas. Co. v. Waller*, 323 F.2d 20, 28–29 (4th Cir. 1963) ("The filing of a supplemental complaint ought to be allowed as of course.") (cleaned up); *Franks v. Ross*, 313 F.3d 184, 198 n.15 (4th Cir. 2002) (holding that motions to supplement "should be freely granted, and should be denied only where 'good reason exists . . ., such as prejudice to the defendants'").

Nonetheless, the district court's refusal to allow Appellant to file his supplemental complaint was harmless. *See Hodges v. Meletis*, 109 F.4th 252, 263 n.17 (4th Cir. 2024) (holding that a district court's abuse of discretion in denying a supplemental pleading can be harmless if it does not affect the substantial rights of the parties). There is no indication that Appellant was prevented from exploring the new factual allegations raised in his supplemental complaint at either of the bench trials on his retaliation claim. Appellant

---

(4th Cir. 1963) ("Rule 15(d) of the Federal Rules of Civil Procedure provides for such a supplemental pleading. It is a useful device, enabling a court to award complete relief, in one action, to avoid the cost, delay, and waste of separate actions which must be separately tried.").

cites only a single allegation from his supplemental complaint that he argues should have been, but was not, considered by the district court. Specifically, Appellant claims the district court did not consider his allegation that Officer Gilbert told Appellant, "You're just a dumb n---r who thinks he's a f---ing lawyer." J.A. 235. The record proves otherwise. The district court did consider this assertion, given that Appellant included the alleged statement by Officer Gilbert in both his opposition to summary judgment and his cross motion for summary judgment. Further, the other claims alleged in the supplemental complaint -- a retaliation challenge, mail room theft allegation, and due process challenge -- were repetitive of Appellant's first complaint. And the district court allowed Appellant to consider all facts relating to those claims in the summary judgment proceedings.

Any abuse of discretion by the district court in failing to grant leave to file the supplemental complaint is, therefore, harmless because all material facts alleged in the supplemental complaint were considered.

## B.

### Eighth Amendment Excessive Force Claim

Next, we consider Appellant's argument that the district court erred in granting Appellees qualified immunity on his Eighth Amendment claim.

### 1.

Section 1983 creates a cause of action against any person who, acting under color of state law, abridges a right arising from the Constitution or laws of the United States. 42 U.S.C. § 1983. However, "a government official sued under § 1983 is entitled to invoke qualified immunity, which is more than a mere defense to liability; it is immunity from suit

itself." *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). A court's qualified immunity analysis asks two questions: "(1) whether a statutory or constitutional violation occurred, and (2) whether the right was clearly established at the time of the violation." *Caraway v. City of Pineville*, 111 F.4th 369, 381 (4th Cir. 2024) (quoting *Aleman v. City of Charlotte*, 80 F.4th 264, 284 (4th Cir. 2023)). A court may consider these questions in either order; and if either question is answered in the negative, then the officer being sued is entitled to qualified immunity. *Id.*

Here, Appellant alleges that the constitutional violation occurred when Officer Gilbert sprayed him with OC spray, which he alleges was excessive force in violation of the Eighth Amendment. An excessive force claim involves both an objective and a subjective component. *Brooks v. Johnson*, 924 F.3d 104, 112–13 (4th Cir. 2019). The objective component asks whether the force applied was sufficiently serious to establish a cause of action, which requires more than a de minimis use of force. *Id.* The district court "presume[d] without finding that three bursts of OC spray in an inmate's facial area, as Gilbert applied to [Appellant], was more than a nontrivial use of force." J.A. 393. We make the same assumption and proceed to the subjective prong.

To satisfy the subjective component of an Eighth Amendment excessive force claim, Appellant must demonstrate that Officer Gilbert "acted with a sufficiently culpable state of mind" in deploying the OC spray. *Iko v. Shreve*, 535 F.3d 225, 239 (4th Cir. 2008) (quoting *Wilson v. Seiter*, 501 U.S. 294, 111 (1991)). The state of mind required in excessive force claims is "wantonness in the infliction of pain." *Id.* (quoting *Whitley v. Abers*, 475 U.S. 312, 322 (1986)). "Put differently, the 'core judicial inquiry' regarding

15

the subjective component of an excessive force claim is 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Id.* (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)).

"Corrections officers act in a good faith effort to maintain or restore discipline -- and therefore, with a permissible motive -- when they attempt to preserve internal order by compelling compliance with prison rules and procedures. *Brooks*, 924 F.3d at 113 (internal citations omitted). We owe officers "wide-ranging deference" in their determinations that force is required to induce compliance with policies important to institutional security. *Id.* The Supreme Court has set forth four non-exclusive factors to assist courts in assessing whether an officer has acted with "wantonness": (1) "the need for the application of force"; (2) "the relationship between the need and the amount of force that was used"; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) "any efforts made to temper the severity of a forceful response." *Iko*, 535 F.3d at 239 (quoting *Whitley*, 475 U.S. at 321). Appellant argues that the district court incorrectly applied the *Whitley* factors in finding that Officer Gilbert did not act with a sufficiently culpable state of mind. In Appellant's view, Appellees are not entitled to qualified immunity at this stage because there is a dispute of material fact as to Officer Gilbert's state of mind. We consider each factor in turn.

a.

First, we consider whether there was a need for force. Appellant claims that his refusal to be handcuffed during the transport to pre-hearing detention did not present a need for force because there was a policy that allowed an SL6 inmate to move around freely

16

without handcuffs.  Appellees respond that Appellant presents no evidence to support his understanding of the handcuff policy.  Further, Appellees argue that there is no dispute that Appellant refused to be restrained to be transported, and that this refusal presented a clear need for force regardless.

As an initial matter, Appellant's understanding of the policy is incorrect.  The VDOC policy allows for SL6 inmates to leave cells unrestrained for specific activities and during certain time periods of the day.  The policy says nothing about what happened here, where an SL6 inmate needed to be transported to pre-hearing detention because he was charged with an infraction.

More important, however, is that Appellant's understanding of the handcuff policy is immaterial.  Instead, as the district court properly held, "[Appellant's] stated belief that [the] policy prohibited Gilbert from placing an SL6 inmate in restraints cannot excuse his noncompliance with officers' orders." J.A. 393.  It is undisputed that Appellant repeatedly refused Officer Gilbert's orders that he must be restrained in order to be safely transported. This repeated refusal demonstrates a clear need for force.  *See Iko*, 535 F.3d at 239 ("[Appellee] can therefore demonstrate that there was a need for the application of force because [the appellant] did not initially comply with orders to cuff up.").

b.

Next, we consider the relationship between the need for force and the amount of force that was used.  On appeal, Appellant argues for the first time that even if his repeated refusal to be restrained justified the first blast of OC spray, it did not automatically justify the two additional blasts.  Appellees respond by first pointing out that this argument was

17

not presented to the lower court in the nine years of this litigation and is therefore waived. On the merits, Appellees assert that it is undisputed that the second and third blasts of OC spray were deployed because Appellant continually refused to comply. Even construing all factual inferences in Appellant's favor, as we must at the summary judgment stage, Appellees have the more accurate assessment of the record.

Appellant's own complaint states, "at this point, [Appellant] was OC sprayed by C. Gilbert on (3) separate occasions and before a physical cell abstraction [*sic*] had taken place, [Appellant] was blinding and choking from the OC spray and complied with being restrained." J.A. 27. Appellant asks us to infer that he was not given a sufficient chance to comply in between each spray and would have complied after the first blast. The record does not support this inference. Appellant himself notes that he only complied after all three OC blasts.

Officer Gilbert's report, compiled on the day of the incident, states that Officer Gilbert deployed the first burst of OC spray at 5:40pm, the second burst at 5:42pm, and the third burst at 5:45pm. Each burst, until the third burst, was deemed ineffective. Appellant provides no evidence to contradict this report, and instead, actually relies on this report to identify the timing of each blast of OC spray. Therefore, there is no genuine dispute that the second and third blasts of OC spray were deployed because Appellant remained noncompliant. Given this record, three blasts of OC spray was a proportionate use of force.

c.

Third, we consider the extent of the threat posed by Appellant that the three bursts of OC spray were intended to quell. Appellant argues that whether he presented a perceived

18

threat to Officer Gilbert is a disputed issue of material fact. Appellant claims he did not refuse to be restrained and was not responding in a threatening manner. In support, Appellant relies on the fact that he has consistently denied threatening any officer, and that the warden dismissed a disciplinary charge lodged against Appellant for making threatening statements to Officer Gilbert during the September 21, 2015 incident. Appellees respond that Appellant's repeated refusal to be restrained posed an actual and unacceptable threat to the safety of Officer Gilbert and other inmates. Appellees also point to Appellant's first-degree murder conviction, possible intoxication, and belligerent manner at the time of the incident to support their argument that Officer Gilbert reasonably perceived a threat.

Appellant's contention that he was not posing a threat is belied by the record. As explained above, there is no genuine dispute that Appellant refused to be restrained. Appellant admits that he argued with Officer Gilbert and only complied with the orders after the three bursts of OC spray. These facts demonstrate that Officer Gilbert reasonably perceived an ongoing threat. *Compare Iko*, 535 F.3d at 240 ("Shreve's final burst of pepper spray was deployed *after* Iko had lain down on the floor of his cell.") (emphasis in original).

d.

Finally, we consider whether Officer Gilbert made any attempt to avoid the force or temper the severity of the force employed. *Brooks*, 924 F.3d at 117 ("*Whitley*'s fourth factor . . . focuses on corrections officers' efforts to avoid or temper a forceful response."). Appellant first argues that Officer Gilbert "failed to temper the severity of the force used in a concrete manner: he did not reassess the need for further force after each spray and

19

attempt to avoid the second or third use of pepper spray." Appellant's Opening Br. at 43. As noted above, however, several minutes passed between each of the sprays and Officer Gilbert deployed the second and third sprays because the earlier ones were ineffective.

Appellant next claims that Appellees did not properly temper the severity of the harm because after he was given the decontamination shower and seen by the nurse, he was not provided a change of clothing -- even though he was permitted to remove his contaminated clothing -- nor was he permitted to wash his eyes a second time. These facts do not indicate that Appellees failed to temper the severity of the force used. *Compare Iko*, 535 F.3d at 240 ("Finally, far from trying to ameliorate the effects of the pepper spray, [Lieutenant] Shreve and the extraction team never changed [the appellant's clothing], never removed the spit mask covering his nose and mouth and never secured him any medical treatment for the exposure.").

2.

Having considered the *Whitley* factors, we conclude that Appellant has not identified any genuine disputes of material fact from which a reasonable jury could infer a malicious, and therefore excessive, use of force. Thus, the district court did not err in granting qualified immunity to Officer Gilbert on Appellant's excessive force claim.

C.

First Amendment Retaliation Claim

1.

"To state a colorable First Amendment retaliation claim, a plaintiff must allege that (1) he engaged in protected First Amendment activity, (2) the defendant took some action

20

that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and the defendant's conduct." *Martin v. Duffy*, 977 F.3d 294, 299 (4th Cir. 2020) (cleaned up). "To demonstrate a causal relationship between protected activity and the defendants' conduct, this Court applies the burden-shifting framework of the same-decision test." *Shaw v. Foreman*, 59 F.4th 121, 130 (4th Cir. 2023). That test first requires the plaintiff to make a prima facie showing that his protected activity was "a substantial or motivating factor" in the defendants' action. *Id.* To make the required showing, the plaintiff must demonstrate: "(1) that the defendant[s were] aware of [his] engaging in protected activity and (2) "some degree of temporal proximity to suggest a causal connection." *Id.* (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005)). If the plaintiff makes a prima facie case, the burden then shifts to the defendants to prove by a preponderance of the evidence that they would have taken the same action in the absence of the plaintiff's protected activity. *Id.* at 130.

First, Appellee concedes, for the purposes of this appeal, that there is no dispute that Appellant engaged in the following activities that are protected by the First Amendment:

- filed a § 1983 action against ROSP officers for an alleged conditions of confinement violation in April 2015;

- testified in another inmate's case in November 2015;

- filed a grievance about his SL status on December 27, 2015;

- filed the present suit on March 2, 2016; and,

- filed a grievance about his SL status on June 22, 2016.

21

Resp. Br. at 42.[7]

Next, Appellant argues that Appellees adversely affected his First Amendment rights by conspiring to delay his progression through the step-down program and prolong his time as an SM inmate. Appellant agues there was "delay" because he remained classified as SM0 and SM1 longer than the minimum of ninety days. And, finally, Appellant argues that Appellees caused this delay in order to retaliate against him for engaging in the protected activities identified above. Appellees respond that Appellant cannot make a prima facie showing of causation because he cannot demonstrate that Appellees were aware of his protected activity. Appellees also argue they would have made the same decisions in the absence of Appellant's protected activity.

2.

Appellant alleges two separate instances of delay in his progression through the step-down program: he was classified as SM0 from October 2015 to March 2016, and as SM1 from March 2016 to April 2017. Despite the fact that Appellant remained at each classification for more than the minimum of ninety days, the district court determined that

---

[7] Qualified immunity is also relevant to Appellant's First Amendment retaliation claim. In this context, we ask whether "existing precedent" has "placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). While we accept Appellee's concessions here, it is unclear whether Appellant had a "clearly established" right to participate in someone else's lawsuit. The right to file lawsuits stems not from the right to free speech but from the right to petition the Government for redress of grievances. *See e.g., Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 387 (2011); *Am. C.L. Union of Md., Inc. v. Wicomico Cnty., Md.*, 999 F.2d 780, 785 (4th Cir. 1993). And since it does not affect the outcome of Appellant's case, we need not address whether this right includes a generalized right to petition on behalf of others. *See Herron v. Harrison*, 203 F.3d 410, 415–16 (6th Cir. 2000).

there was no delay that adversely affected Appellant's First Amendment rights.  Even if we assume the district court clearly erred in that determination, it is of no avail to Appellant because we agree with Appellees that Appellant nonetheless failed to establish causation.  First, there is no evidence that Appellees were aware of any of Appellant's protected activity during the first alleged delay.  Therefore, Appellant cannot make a prima facie showing of causation.  And second, even if Appellees were aware that Appellant filed this lawsuit during the second alleged delay, we agree with the district court that Appellees sufficiently demonstrated they would have made the same decisions with regard to Appellant's SM classifications in the absence of his protected activity.

The lower court heard testimony from Officer Gilbert and ROSP Counselors Duncan and Gallihar on this issue.  Both Gilbert and Duncan testified that Appellant's step-down progression was delayed because Appellant routinely failed to meet the behavioral goals required for advancement.  Specifically, Gilbert and Duncan testified that Appellant failed to demonstrate the necessary level of respect based on his repeated use of profanity.  Further, Appellant himself testified that he was told his failure to meet the respect standards was the reason for his delayed progression.  Finding this testimony credible, the district court determined that any delay in Appellant's progression through the step-down program was the result of Appellant failing to meet the eligibility requirements.

We agree.  The evidence establishes that Appellees would have made the decision with respect to Appellant's step-down progress because any delay Appellant faced was the result of his own behavior, and not any retaliatory action.

23

3.

As a final matter, Appellant also alleges that Officers Lewis and Adams retaliated against him for assisting other inmates in their own lawsuits against ROSP. Appellant alleges Officers Lewis and Adams called him a snitch in the presence of other inmates on two separate occasions. Appellees assert that any such claim has been waived because it was presented for the first time on appeal. Appellant responds that this claim was presented to the district court in his pro se complaint, and that the district court's failure to recognize this claim violated the requirement that pro se pleadings be construed liberally. *Martin*, 977 F.3d at 298 (holding that "we read the pleadings of a pro se plaintiff liberally and interpret them to raise the strongest arguments that they suggest") (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)). This allegation was made on a single line of Appellant's complaint in the middle of his discussion of the alleged delay through the step-down program.

In its initial grant of summary judgment, the district court did not identify a separate retaliation claim based on the snitch allegation but instead considered the allegation as part of Appellant's step-down program retaliation claim. Throughout each bench trial, the magistrate judge, and the district court on review, again failed to identify any distinct retaliation claim based on the snitch allegation, even though the trials both explicitly considered the veracity of the snitch allegations and concluded that neither Officer Lewis nor Officer Adams called Appellant a snitch. Reviewing the complaint on appeal, we also do not discern a distinct claim of retaliatory snitch name calling. Notably, neither did Appellant's counsel. When Appellant obtained counsel following our remand order

24

requiring the magistrate judge to again consider Appellant's retaliation claims under the *Martin* causation standard, his counsel did not raise a distinct retaliation claim based on the snitch allegation. Therefore, even interpreting Appellant's pro se complaint liberally, we conclude that this claim is not properly before us because it was not raised -- even with the benefit of counsel.

## IV.

Because Appellant fails to demonstrate any genuine dispute of material fact as to Officer Gilber's state of mind, Appellees are entitled to qualified immunity on the excessive force claim. And because Appellant cannot overcome the same decision test to establish causation on his First Amendment retaliation claims, the judgment of the district court is

*AFFIRMED.*

25